

1995 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

3-10-1995

# In Re: Columbia Gas

Precedential or Non-Precedential:

Docket 93-7409

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1995

Recommended Citation
"In Re: Columbia Gas" (1995). *1995 Decisions*. Paper 71.
http://digitalcommons.law.villanova.edu/thirdcircuit_1995/71

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1995 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 93-7409
_____


IN RE: COLUMBIA GAS SYSTEM INC.;
COLUMBIA GAS TRANSMISSION CORPORATION,
                                    Debtors

          ENTERPRISE ENERGY CORPORATION,
                                    Appellant

                      v.

          UNITED STATES OF AMERICA,
          On behalf of the I.R.S.

               THOMAS E. ROSS,
                         Trustee


_____

On Appeal from the United States District Court
        for the District of Delaware
      (D.C. Civil Action No. 92-00258)
          _____


          Argued January 19, 1994

      Before:  SLOVITER, Chief Judge,
       SCIRICA and LEWIS, Circuit Judges

          (Filed  March 10, 1995)


               ROBERT J. SIDMAN, ESQUIRE (ARGUED)
               DUKE W. THOMAS, ESQUIRE
               Vorys, Sater, Seymour & Pease
               52 East Gay Street
               Columbus, Ohio 43216

               Attorneys for Appellant,
               Enterprise Energy Corporation

ROBERT S. BRADY, ESQUIRE
Young, Conaway, Stargatt & Taylor
P.O. Box 391
Rodney Square North, 11th Floor
Wilmington, Delaware 19899-0391

   Attorney for Appellees,
   Columbia Gas System Inc. and
   Columbia Gas Transmission Corporation


LINDA E. MOSAKOWSKI, ESQUIRE (ARGUED)
GARY R. ALLEN, ESQUIRE
DAVID E. CARMACK, ESQUIRE
United States Department of Justice
Tax Division
P.O. Box 502
Washington, D.C. 20044

   Attorneys for Appellee,
   United States of America,
   On behalf of the I.R.S.

------------------------

OPINION OF THE COURT

------------------------


SCIRICA, <u>Circuit</u> <u>Judge</u>.


In this bankruptcy matter, we must decide whether certain terms in a class action settlement agreement constitute an executory contract under 11 U.S.C. § 365 (1988). The Internal Revenue Service contended the settlement agreement was not an executory contract. Both the bankruptcy court and the district

court[1] agreed with the IRS, and the class members appealed.  We will affirm.

I.

The facts are undisputed.  Columbia Gas System, Incorporated, its subsidiary, Columbia Gas Transmission Corporation (TCO), and their affiliates comprise a natural gas system which explores, produces, purchases, stores, transmits, and distributes natural gas.  TCO is Columbia Gas System's principal gas purchaser from producers in the Southwest, Midcontinent, and Appalachia and operates extensive underground storage facilities.

On July 26, 1985, Enterprise Energy Corporation and two other companies filed a class action against TCO in the United States District Court for the Southern District of Ohio.  The district court certified as a class[2] the producers of natural gas in the Appalachian region who were parties to gas purchase contracts with TCO.  The class comprised 2163 member producers

---

[1]. The district court's opinion is published as Enterprise Energy Corp. v. United States ex rel. IRS (In re Columbia Gas System, Inc.), 146 B.R. 106 (D. Del. 1992).

[2]. The class consists of "[a]ll owners, operators and producers of natural gas producing wells in the Appalachian region (New York, Pennsylvania, West Virginia, Kentucky, Maryland, Virginia and Ohio) who are parties to gas purchase contracts with Columbia Gas Transmission Corporation entitling them to receive the maximum lawful price or a deregulated price under the NGPA . . . and against whom Columbia has invoked a price reduction for amounts due under the contracts."  Enterprise Energy Corp. v. Columbia Gas Transmission Corp., 137 F.R.D. 240, 243 (S.D. Ohio 1991).

who held 852 gas purchase contracts. TCO had invoked a price reduction under a cost recovery clause which formed the basis of their complaint.

The gas purchase contracts set the price for each unit of natural gas delivered to TCO at the maximum price permitted under the Natural Gas Policy Act of 1978 during the month of delivery. The class members alleged that TCO breached their gas purchase contracts by paying less than the maximum price after it invoked the cost recovery clause.

For five years there was extensive discovery. As trial loomed, the parties entered into a Stipulation of Proposed Class Action Settlement ("settlement agreement"), which the district court approved on June 18, 1991. Enterprise Energy Corp. v. Columbia Gas Transmission Corp., 137 F.R.D. 240 (S.D. Ohio 1991). Incidental to its approval under Federal Rule of Civil Procedure 23(e), id. at 248, the court issued an order stating in part:

> f. Named plaintiffs, Class Members and defendant [TCO] shall now consummate and be bound by the Settlement.
>
> g. Except for claims arising under the Settlement on behalf of Class Members or Columbia, and at such time as this Order of the Court approving the Settlement as final is non-appealable, named plaintiffs and all Class Members . . . shall be deemed to release and forever discharge the defendant . . . from any and all claims of the type asserted in this litigation relating to defendant's exercise of the cost recovery clause contained in the Class Members' gas purchase contracts at any time during the period commencing on or about July 10, 1985 and ending on or about July 10, 1991.

> h. Jurisdiction is hereby retained as to matters related to the interpretation, administration and consummation of the Settlement as approved in this Order.

Id. at 252. The order became final and unappealable on July 18, 1991.

The settlement agreement required TCO to deposit $30 million into an escrow account "in settlement of, and as a full and complete discharge and release of TCO, for all of [the class members'] claims arising on or before January 1991." Enterprise Energy Corp. v. United States ex rel. IRS (In re Columbia Gas System, Inc.), 146 B.R. 106, 109 (D. Del. 1992). TCO was to pay $15 million into escrow by March 21, 1991, and the other $15 million by March 23, 1992. This schedule was apparently set for TCO's convenience; TCO's duty to make the second payment was not contingent on the class members' performance of any of their obligations. TCO paid the first $15 million on time but then filed for bankruptcy.

Under the settlement agreement, class members were entitled to receive their share of the escrow monies only after they executed a release of claims and a supplemental contract. The settlement agreement stated "payments to individual Class Members out of the escrowed amounts will be contingent upon receipt by [TCO] of a duly executed release of all such Claims and a duly executed contract supplement . . . ." J. App. at 57-58. While each class member had to execute a release to get payment from the escrow fund, the claims each held against TCO were to be extinguished (and they in fact were, see supra,

district court order ¶ g) by the court order accepting the settlement agreement.

The supplemental contracts were designed to implement amendments and clarifications of pricing and other terms concerning future gas deliveries to TCO.  The settlement agreement established the terms of these contracts, including increasing the price TCO would pay to the class members.  Because many class members relied on TCO as the principal purchaser of their gas, the supplemental contracts were important to them, a point made in the following exchange at oral argument before the district court:

> The Court: So that . . . supplying the supplemental agreements, contracts, was not just an option that [the class members] had.  It was necessary for their continued operation?
>
> [Counsel for the Class]: Exactly, your honor.  Exactly.

Id. at 276.

By July 31, 1991, the class members involved in forty-one of the purchase contracts had completed the execution of the release and supplemental contracts and were entitled to their share of the escrow monies.  But on that day, thirteen days after the settlement agreement had become final, TCO filed a voluntary Chapter 11 petition in bankruptcy in Delaware.  On February 20, 1992, the class members filed a motion to compel TCO to assume or reject the settlement agreement under the Bankruptcy Code, 11

U.S.C. § 365.[3]  TCO and the class members had agreed that TCO would assume the settlement agreement and jointly filed a proposed order.

After notice of the proposed order was sent to the proper parties, the United States filed an objection on behalf of the Internal Revenue Service, one of TCO's creditors.[4]  Finding the settlement agreement was not executory within the meaning of 11 U.S.C. § 365, the bankruptcy court upheld the objection and denied the class members' motion.[5]

The class members appealed to the United States District Court for the District of Delaware.  The district court held that the settlement agreement was a contract, but affirmed the bankruptcy court on the grounds the contract was not executory for purposes of § 365.  In re Columbia Gas, 146 B.R. at 113-14.  Therefore TCO did not have the option of assuming or

---

[3].  Section 365 provides in part:

> **§ 365.  Executory contracts and unexpired leases**
>
> **(a)**  Except as provided in sections 756 and 766 of this title and in subsections (b), (c), and (d) of this section, the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor.

[4].  The record suggests that the IRS's claim is substantial, apparently in the range of $500 million over the next five years. J. App. at 287.

[5].  The bankruptcy court also apparently held the settlement agreement was not a contract, as it cited cases holding that judicial orders cannot be considered executory contracts.

rejecting the settlement agreement.  Id. at 114.  This appeal followed.

## II.

We "exercise plenary review of the legal standard applied by the district and bankruptcy courts, but review the latter court's findings of fact on a clearly erroneous standard." In re Abbotts Dairies, Inc., 788 F.2d 143, 147 (3d Cir. 1986) (citations omitted).  "Because in bankruptcy cases the district court sits as an appellate court, our review of the district court's decision is plenary."  Brown v. Pennsylvania State Employees Credit Union, 851 F.2d 81, 84 (3d Cir. 1988); see also Universal Minerals, Inc. v. C.A. Hughes & Co., 669 F.2d 98, 101 (3d Cir. 1981).

Jurisdiction in the bankruptcy court was proper under 28 U.S.C. § 157(a) (1988).  The district court had jurisdiction over the appeal from the final order of the bankruptcy court, id. § 158(a), and we have jurisdiction over the appeal of the district court's judgment under 28 U.S.C. § 158(d).

## III.

In this appeal, we must decide whether the settlement agreement was a contract, and if so, whether it was executory so that TCO could elect to assume or reject it under § 365 of the Bankruptcy Code.

The IRS argues the settlement agreement is not a contract but a judgment of the court.[6]  It maintains "[s]ince the

---

[6].  The class members contend the IRS did not properly preserve this point for appeal because it did not cross-appeal from the

Settlement Agreement was merged into the court's judgment, it cannot be an executory contract within the meaning of Bankruptcy Code Section 365."  Appellee's Br. at 32.  The bankruptcy court apparently agreed, observing "there is authority to the effect that the phrase 'executory contract' should not normally be applied to a judicial order."  J. App. at 178.  While the bankruptcy court did not explicitly hold the agreement was a judgment, the cases it cited[7] hold that where contracts have been reduced to judgment there is no "contract" remaining for purposes of § 365.  The district court, however, distinguished those cases, holding "[f]or bankruptcy purposes . . . it is appropriate to treat the judicially approved settlement agreement in this case as a contract."  In re Columbia Gas, 146 B.R. at 113.

At the outset, we should ask whether this settlement agreement would be considered a contract had there been no bankruptcy.  Generally, application of the Bankruptcy Code does not change the attributes of a given legal relationship.  Butner

(..continued)
district court's judgment which held the settlement agreement is a contract.  We disagree because "it is . . . settled that the appellee may, without taking a cross-appeal, urge in support of a decree any matter appearing in the record, although his argument may involve an attack upon the reasoning of the lower court or an insistence upon a matter overlooked or ignored by it."  Dalle Tezze v. Director, Office of Workers' Compensation Programs, United States Dep't of Labor, 814 F.2d 129, 132 (3d Cir. 1987) (quoting United States v. American Ry. Express Co., 265 U.S. 425, 435 (1924)).

[7].  Roxse Homes, Inc. v. Roxse Homes Ltd. Partnership, 83 B.R. 185 (D. Mass.), aff'd without op., 860 F.2d 1072 (1st Cir. 1988); In re Jolly, 574 F.2d 349 (6th Cir.), cert. denied, 439 U.S. 929 (1978).

v. United States, 440 U.S. 48 (1979).  Thus, if the settlement agreement should be considered a contract under relevant nonbankruptcy law, it will be a contract in bankruptcy "[u]nless some federal interest requires a different result . . . ."  Id. at 55.

Although settlement agreements may be judicially approved, they share many characteristics of voluntary contracts and are construed according to traditional precepts of contract construction.  cf. Fox v. United States Dep't of Housing & Urban Dev., 680 F.2d 315, 319 (3d Cir. 1982) (observing this point for consent decrees).  In a nonbankruptcy context, we have treated a settlement agreement as a contract.  See Halderman v. Pennhurst State Sch. & Hosp., 901 F.2d 311, 318 (3d Cir.), cert. denied, 498 U.S. 850 (1990).

We see nothing special in this bankruptcy that counsels a different approach.  The core of this settlement agreement was consensual obligations.  The parties crafted the agreement and the court approved it.  There is no judgment on the merits, a factor that distinguishes cases cited by the bankruptcy court.  Furthermore, the rights and obligations of the parties do not derive solely from the court's judgment, but depend at least in part on the performance of the other party.  What is especially significant in this case is that there remains an agreement that the debtor can breach which could give rise to a claim against it.  Although we recognize that not all settlement agreements should be considered contracts, we believe the factors already enumerated are sufficient to consider this settlement agreement

as a contract for purposes of § 365.  In this respect, we agree with the district court.

                                   IV.

The heart of this dispute is whether the settlement agreement was executory on July 31, 1991, when TCO filed its bankruptcy petition.  The term "executory contract" is not defined in the Bankruptcy Code, and the phrase does not indicate its intended scope.

The legislative history of § 365 suggests a broad reading of "executory."  Congressional reports stated "[t]hough there is no precise definition of what contracts are executory, it generally includes contracts on which performance remains due to some extent on both sides."  H.R. Rep. No. 595, 95th Cong., 1st Sess. 347 (1977), reprinted in 1978 U.S.C.C.A.N. 5963, 6303; S. Rep. No. 989, 95th Cong., 2d Sess. 58 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5844.

Most courts have agreed that the definition suggested by the legislative history would cut too broadly, "since it is the rare agreement that does not involve unperformed obligations on either side."  Mitchell v. Streets (In re Streets & Beard Farm Partnership), 882 F.2d 233, 235 (7th Cir. 1989).  As one commentator observed, "[a]ll contracts to a greater or less extent are executory.  When they cease to be so, they cease to be contracts."  Vern Countryman, Executory Contracts in Bankruptcy: Part I, 57 Minn. L. Rev. 439, 450 (1973) (citation omitted).

The language and legislative history of § 365 having proved unavailing, courts and commentators sought to analyze the

purpose of § 365 in order to formulate a definition of "executory contract."  Executory contracts in bankruptcy are best recognized as a combination of assets and liabilities to the bankruptcy estate; the performance the nonbankrupt owes the debtor constitutes an asset, and the performance the debtor owes the nonbankrupt is a liability.  See Thomas H. Jackson, The Logic and Limits of Bankruptcy Law 106-07 (1986).  The debtor (or trustee that has stepped into the debtor's shoes) may elect to assume an executory contract, in which case § 365 mandates that the debtor accept the liability with the asset and fully perform his end of the bargain.  11 U.S.C. § 365(b).

The debtor will assume an executory contract when the package of assets and liabilities is a net asset to the estate. When it is not the debtor will (or ought to) reject the contract. 11 U.S.C. § 365(a).  Because assumption acts as a renewed acceptance of the terms of the executory bargain, the Bankruptcy Code provides that the cost of performing the debtor's obligations is an administrative expense of the estate, which will be paid first out of the assets of the estate.[8]  11 U.S.C. §

---

[8].  In In re Taylor, 913 F.2d 102, 106-07 (3d Cir. 1990), we stated:

> [T]he "assume or reject" dichotomy means
> simply that if the trustee wishes to obtain
> for the estate the future benefits of the
> executory portion of the contract, the
> trustee must also assume the burdens of that
> contract, as an expense of bankruptcy
> administration (i.e., having priority over
> all pre-bankruptcy claims of creditors).

507(a)(1) (1988); University Medical Ctr. v. Sullivan (In re University Medical Ctr.), 973 F.2d 1065, 1078 (3d Cir. 1992).

In cases where the nonbankrupt party has fully performed, it makes no sense to talk about assumption or rejection. At that point only a liability exists for the debtor--a simple claim held by the nonbankrupt against the estate, Jackson, supra, at 106--and "[t]he estate has whatever benefit it can obtain from the other party's performance and the trustee's rejection would neither add to nor detract from the creditor's claim or the estate's liability." Countryman, supra, at 451. Rejection is meaningless in this context, and assumption would be of no benefit to the estate, serving only to convert the nonbankrupt's claim into a first priority expense of the estate at the expense of the other creditors.[9] Id. at 452.

(..continued)
Through the mechanism of assumption, § 365 allows the debtor to continue doing business with others who might otherwise be reluctant to do so because of the bankruptcy filing. Richmond Leasing Co. v. Capital Bank, N.A., 762 F.2d 1303, 1310 (5th Cir. 1985).

Rejection, which is appropriate when a contract is a liability to the bankrupt, is equivalent to a nonbankruptcy breach. 11 U.S.C. § 365(g). Rejection leaves the nonbankrupt with a claim against the estate just as would a breach in the nonbankruptcy context, and unless the nonbankrupt's claim is somehow secured, he will be a general unsecured creditor of the estate. Accordingly, if the debtor is insolvent, the nonbankrupt's claim for breach will not be paid in full. An appropriate rejection in bankruptcy will thus benefit the creditors as a whole at the expense of the nonbankrupt. See Thomas H. Jackson, The Logic and Limits of Bankruptcy Law 108 (1986).

[9]. In this circumstance, elevating the nonbankrupt's claim to administrative expense priority by "assuming" it would offend "the general policy of the bankruptcy laws [which] is equality of distribution among all creditors . . . ." H.R. Rep. No. 595,

Likewise, if the debtor has fully performed, the performance owed by the nonbankrupt is an asset of the bankruptcy estate and should be analyzed as such, not as an executory contract. Jackson, supra, at 107. Rejection of the contract at this point is no different from abandonment of property of the estate, an action taken only when the property is "burdensome to the estate or . . . is of inconsequential value and benefit to the estate." 11 U.S.C. § 554(a) (1988).

These considerations led us to adopt, as have many courts of appeals, the following definition of executory contract for purposes of § 365: "[An executory contract is] a contract under which the obligation of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing performance of the other." Sharon Steel Corp. v. National Fuel Gas Distrib. Corp., 872 F.2d 36, 39 (3d Cir. 1989) (citing cases).

Thus, unless both parties have unperformed obligations that would constitute a material breach if not performed, the contract is not executory under § 365. When it is the nonbankrupt party who has substantially performed so that its failure to complete performance would not constitute a material breach excusing performance of the debtor,[10] the nonbankrupt

(..continued)
95th Cong., 1st Sess. 186 (1977), reprinted in 1978 U.S.C.C.A.N. 5963, 6147.

[10]. In order to determine whether failure to perform the remaining obligations would constitute a material breach, we need to consider contract principles under the relevant nonbankruptcy

party is "relegated to the position of a general creditor of the

bankrupt estate." Marcus & Millichap Inc. v. Munple, Ltd. (In re

(..continued)
law. In Hall v. Perry (In re Cochise College Park, Inc.), 703
F.2d 1339, 1348 n.4 (9th Cir. 1983), the court noted "a
bankruptcy court should determine whether one of the parties'
failure to perform its remaining obligations would give rise to a
'material breach' excusing performance by [the] other party under
the contract law applicable to the contract . . . ." See also
Terrell v. Albaugh (In re Terrell), 892 F.2d 469, 472 (6th Cir.
1989) (citing In re Cochise); Mitchell v. Streets (In re Streets
& Beard Farm Partnership), 882 F.2d 233, 235 (7th Cir. 1989)
(looking to relevant state law).

        In this case, the settlement agreement was created by
the parties in a federal court in Ohio, and Ohio law would
therefore normally apply. Klaxon Co. v. Stentor Co., 313 U.S.
487, 496 (1941). However, the parties do not indicate any
particular law as governing either the issue of material breach
or the construction of the settlement agreement. Where, as here,
"the parties do not make an issue of choice of law, we have no
obligation to make an independent determination of what rule
would apply if they had made an issue of the matter." In re
Stoecker, 5 F.3d 1022, 1029 (7th Cir. 1993). Accordingly, like
the parties and the district court, we will construe the issue of
what would constitute a material breach under general contract
principles. See Schiavone Constr. Co. v. Time, Inc., 847 F.2d
1069, 1076 n.3 (3d Cir. 1988) (allowing consensus of parties and
lower courts as to choice of law to control when no reason to
unsettle that agreement is present).

        Finally, we believe application of Ohio law would
result in a similar analysis of the general contract principles
upon which we rely. See Rhodes v. Rhodes Indus., Inc., 595
N.E.2d 441, 447 (Ohio Ct. App. 1991) (adopting Restatement of
Contracts (Second) approach to materiality of breach); see also
Kichler's, Inc. v. Persinger, 265 N.E.2d 319, 321 (Ohio Ct. App.
1970); Blenheim Homes, Inc. v. Mathews, 196 N.E.2d 612, 614 (Ohio
Ct. App. 1963); Boehl v. Maidens, 139 N.E.2d 645, 649 (Ohio Ct.
App. 1956). Thus, there is no need for us to examine further the
issue of which substantive law to apply, as the result does not
depend on our choice. Weekes v. Michigan Chrome & Chem. Co., 352
F.2d 603, 606 (6th Cir. 1965); cf. Benevides v. Alexander (In re
Alexander), 670 F.2d 885, 888 (9th Cir. 1982) (holding no need to
look at state law for whether contract is an executory contract,
but even if examined under state law there would be no change in
the outcome).

Munple, Ltd.), 868 F.2d 1129, 1130 (9th Cir. 1989). The time for testing whether there are material unperformed obligations on both sides is when the bankruptcy petition is filed. Collingwood Grain, Inc. v. Coast Trading Co. (In re Coast Trading Co.), 744 F.2d 686, 692 (9th Cir. 1984) (holding contracts executory at time of petition can be assumed); Carlson v. Farmers Home Admin. (In re Newcomb), 744 F.2d 621, 624 (8th Cir. 1984) (stating critical time to be when the petition was filed).

As we have noted, at stake is the relative priority[11] of the claims of the IRS and the class members to TCO's assets in bankruptcy. If the contract is executory, TCO would assume it, and the $15 million TCO still owes would become an administrative expense of the estate. As an administrative expense, the class members' claims would fall into the category afforded highest payment priority. 11 U.S.C. § 507(a)(1); University Medical Ctr., 973 F.2d at 1078. If the contract is not executory, the class members would have a general unsecured claim and would have lowest payment priority, and would be paid after the IRS's claim, which is seventh in priority regardless of the outcome of this dispute. 11 U.S.C. § 507(a)(7) (1988).[12]

---

[11]. The priority of the claims determines whether and how much of the claims are paid, regardless of whether the debtor liquidates or reorganizes. See 11 U.S.C. § 726(a)(1) (1988) (specifying liquidation scheme with first priority claims paid before seventh priority claims, which are paid before unsecured claims); id. § 1129(a)(8), (9) (requiring administrative expenses to be paid in full in cash on effective date of a reorganization).

[12]. We note the IRS's claim would have eighth priority in cases commenced after October 22, 1994. See Bankruptcy Reform Act of

A.

The contract was clearly executory on TCO's side when it filed for bankruptcy, a point both parties appear to accept. It had not paid the second $15 million into escrow, nor had it completed the administrative work necessary to authorize distribution of the escrow monies to those class members who had signed and executed releases and supplemental contracts. While the administrative details TCO still had to perform are arguably non-material (an issue we need not reach), the $15 million payment is unquestionably a material obligation,[13] and TCO's failure to make the second payment certainly would constitute a material breach.

B.

The materiality of the class members' unperformed obligations is a closer question. As we have noted, the obligations on both sides must be so far unperformed so that failure of either to complete performance would constitute a material breach excusing performance of the other. The class members had unperformed duties under the settlement agreement. Only 41 of the 852 contracts had been processed when TCO filed for bankruptcy, and the class members responsible for the remaining 811 contracts still had to execute releases and

(..continued)
1994, Pub. L. No. 103-394, §§ 304(c), 702, 108 Stat. 4106, 4132 (1994).

[13]. While the district court suggests TCO's completed performance was substantial, it stops short of stating TCO's remaining obligations were not material. In re Columbia Gas, 146 B.R. at 114.

supplemental contracts in order to receive their shares of the escrow fund. It must be the contention of the class members that these obligations are sufficiently material that failure to perform would constitute a material breach of the agreement by the class members.[14]

In order to determine the materiality of the class members' obligations, we turn first to basic contract principles. There is a distinction in the law between failure of a condition[15] and a breach of a duty: "Non-occurrence of a condition is not a breach by a party unless he is under a duty that the condition occur." Restatement (Second) of Contracts § 225(3) (1981).[16] This distinction between a condition and a duty

---

[14]. The class members also argue the settlement agreement represents an accord, which, if not satisfied, would allow the members to revive their original claims against TCO. They cite In re Miller, 54 B.R. 710, 712 (Bankr. D.N.D. 1985), which distinguishes novation, an agreement to extinguish one duty and replace it with another, from an accord, by which a party agrees to accept a substitute performance for a pre-existing duty, although the original duty is not extinguished until the accord is performed. While the court stated that novation is never presumed in an ambiguous situation, id. at 713, we believe this situation is not ambiguous. Unlike the parties in In re Miller, who had specifically allowed for reinstatement of the original claim upon failure of the settlement, id., the parties here have an explicit court order which extinguishes the old claims and replaces them with the Settlement Agreement. See supra part I for the text of the district court's order. As the district court noted, "[T]he order approving the settlement agreement suggests that there could only be an action for breach of contract." In re Columbia Gas, 146 B.R. at 113 n.3. We agree.

[15]. The Restatement has dropped the term "condition precedent" in favor of simply stating it as "condition." E. Allen Farnsworth, 2 Farnsworth on Contracts § 8.2, at 349 (1990). We will follow that convention here.

[16]. See Restatement (Second) of Contracts § 225 cmt. d, which provides:

(or promise) is important here.  The Restatement makes clear that while "a contracting party's failure to fulfill a condition excuses performance by the other party whose performance is so conditioned, it is not, without an independent promise to perform the condition, a breach of contract subjecting the nonfulfilling party to liability for damages."  Merritt Hill Vineyards, Inc. v. Windy Heights Vineyard, Inc., 460 N.E.2d 1077, 1081-82 (N.Y. 1984) (citing Restatement (Second) of Contracts § 225).  In this case, if the remaining obligations in the contract are mere conditions, not duties, then the contract cannot be executory for purposes of § 365 because no material breach could occur.

The determination whether a contract term is a promise or condition is a problem of interpretation, so that "each case turns on its own facts . . . ."  E. Allen Farnsworth, 2 Farnsworth on Contracts § 8.4, at 366 (1990).  We are mindful that:

> Interpreting a settlement agreement presents a question of contract law, in which [t]he primary object . . . is to give effect to the intention of the parties.  Absent clear language in the settlement agreement to resolve a dispute over the proper construction of a contract, a court may go outside the four corners of the contract and consider extrinsic and parol evidence

(..continued)

> [A] term making an event a condition of an obligor's duty does not of itself impose a duty on the obligee and the non-occurrence of the event is not of itself a breach by the obligee.  Unless the obligee is under such a duty, the non-occurrence of the event gives rise to no claim against him.

presented by the parties.  This requires the
district court to then conduct fact-finding
so that it may resolve the ambiguities
inherent in the contract. . . . [But i]f the
court finds that a contract is ambiguous and
that extrinsic evidence is undisputed, then
the interpretation of the contract remains a
question of law for the court to decide.

Lumpkin v. Envirodyne Industries, Inc., 933 F.2d 449, 455-56 (7th
Cir.), cert. denied, 502 U.S. 939 (1991) (citations omitted).

1.

With these principles in mind, we turn first to an
analysis of the releases and then to the contract supplements.
If a class member declined to execute a release, the settlement
agreement provides that TCO retains that class member's portion
of the $30 million.  But the class member's cause of action
against TCO on the gas purchase contract would not be revived.
All such claims were extinguished when the district court's order
became final on July 18, 1991.[17]

_____

[17]. The settlement agreement here is much like the insurance
contract in Commercial Union Insurance Co. v. Texscan Corp. (In
re Texscan Corp.), 976 F.2d 1269, 1273 (9th Cir. 1992), where the
court held that because of a statute, the bankrupt's failure to
pay insurance premiums could not relieve the nonbankrupt insurer
from its obligation to provide insurance coverage.  Even if the
failure to pay premiums might be a material breach absent the
statute, the court held, the statute meant the insurer's
performance was not excused and therefore the definition of
"executory" in the Bankruptcy Code was not met.  Id.  Here, even
if the failure to execute the releases and supplemental contracts
were a breach of part of the settlement agreement (which we hold
it is not), the operation of the court order would prevent that
breach from operating to excuse performance by either the class
members or TCO.  Thus, on this basis as well, the remaining
obligations do not suffice to make the contract executory.

The language of the settlement agreement makes clear the parties intended to make execution of the releases a condition of payment rather than a duty: "[P]ayments to individual Class Members out of the escrowed amounts will be contingent upon receipt by [TCO] of a duly executed release . . . . If the amount allocated to a particular contract by Class Counsel . . . is not finally distributed to that particular contract, then such Distributable Amount . . . shall be returned to [TCO] . . . ." J. App. at 57–58, 64–65.[18] The parties specified that the class members' claims would be extinguished (as they in fact were) by the court order accepting the settlement agreement. Thus, the releases served no more than the administrative purpose of a condition to the class members' ability to get payment from the escrow fund.

The numerous references in the agreement stating a given clause as "Subject to final Court approval of the Settlement," or the equivalent, see ¶¶ 1, 2, 4, 5, 6, 7, 8, 9, 11, 12, 14, J. App. at 57–66, also demonstrate how the parties intended to allocate rights and duties in the contract. The "subject to" phrase was used largely to qualify TCO's duty to pay money, demonstrating that "final Court approval" was the linchpin of the contract for TCO because the heart of the exchange was extinguishing the class members' claims in exchange for money.

---

18. The class members also argue that TCO's recovery of unused money in substance excuses TCO's performance of payment, therefore making the contract executory under the definition in Sharon Steel Corp. v. National Fuel Gas Distribution Corp., 872 F.2d 36, 39 (1989). We do not agree.

The claims were extinguished upon final court approval and the parties made that event, not execution of the releases, key to the agreement.

The consequence of a class member's failure to execute a release supports this textual analysis. A class member who failed to execute a release would not get its share of the settlement fund, but TCO would still get the benefit of the class member's inability to sustain a cause of action. As the district court observed, "the parties seem to agree that if this case involved a simple exchange of money for execution of a release of all claims, there would be no question that the contract would not be executory." In re Columbia Gas, 146 B.R. at 114. Nor would any class member's failure absolve TCO from its duty to place the second $15 million into escrow, a duty which was to ripen on March 23, 1992, without regard to the actions of any class member. No failure on the part of the class members to execute a release under the settlement agreement could have created a material breach of the contract. Rather, the releases were a condition for each member to get its share of the settlement money.

2.

The settlement agreement also required each class member to complete a supplemental contract for future gas sales to TCO. The question is whether that obligation is sufficient to constitute a "duty" as expressed in the Restatement section 225.

There is no indication that the supplemental contracts were designed to do more than take the terms of the global

settlement agreement created by the class and TCO and apply them specifically to each class member.  As such they were functionally ministerial duties; they did not, nor were they supposed to, alter the relationship forged by the settlement agreement.  The terms of the supplemental contracts were expressly stated in the settlement agreement itself and were designed to be implemented with it.  This demonstrates the supplemental contracts were intended to confirm, not to create, the new purchasing arrangement between TCO and the class members.

We agree with the district court that "executing the contract supplements will be little more than a perfunctory act utilizing preapproved terms and conditions.  Obviously these ministerial acts are analogous to the execution of the release to be found in the settlement of any case."  In re Columbia Gas, 146 B.R. at 114; see also Mitchell v. Streets (In re Streets & Beard Farm Partnership), 882 F.2d 233, 235 (7th Cir. 1989) (holding unperformed delivery of legal title to be a formality rather than "the kind of significant legal obligation that would render the contract executory"); In re GEC Indus., 107 B.R. 491, 492 (Bankr. D. Del. 1989) (holding seller's unperformed warranty obligations insufficient to make contract executory; buyer's administrative steps to submit claims for breach of warranty are merely procedural and do not make contract executory).  An individual class member's failure to execute the supplemental contract would not constitute a material breach of the settlement agreement but rather would be the failure of a condition that would relieve

TCO's obligation to pay that member its portion of the escrow monies.[19]

Further, TCO cannot really be concerned with whether a given class member executes a supplemental contract, as the main terms governing the future purchases were embodied in the settlement agreement itself. The supplemental contracts were more important to the class members (the obligors) than to TCO (the obligee). Class counsel made clear before the district court that the supplemental contracts were important to the class members. The supplemental contracts required TCO to pay higher

_____

[19]. Although in a different context, we believe In re Sudbury, Inc., 153 B.R. 776 (Bankr. N.D. Ohio 1993), is instructive. The debtor claimed its insurance policies and related retrospective premium payments were not executory contracts. Id. at 776. The insurers argued the policies were executory and that the premium claims should get administrative expense priority. Id. at 776–77. Bankruptcy did not relieve the insurers' obligation to provide coverage, and the payments the debtor owed did not alone make the policies executory. Id. at 778.

The insurers argued the debtor had obligations to fulfill under cooperation clauses in the event it filed a claim. Id. at 779. The court held these obligations were not enough to make the policies executory. The court observed the debtor's failure to fulfill these obligations on a particular claim would only provide an insurer with a defense to that claim, but would not void the insurers' general obligations under the policies. Id. The court also noted that the insurers' concern was gaining administrative expense priority, not having the debtor perform the cooperation clauses. Id. at 780–81.

The supplemental contracts here are analogous to the obligations under the cooperation clauses. The analogy is inexact but it illustrates the function of the supplemental contracts. The debtor's failure to cooperate on a given claim, like a class member's failure to execute a supplemental contract, would relieve the other party (TCO/the insurers) from paying that one claim but not from the more general obligations embodied in the settlement agreement/insurance policies as a whole.

prices than under the old contracts and thus benefitted the class, and the class even concedes the primary benefit of the contract supplements inured to the class members.  Without more, it was unlikely that the parties intended that failure to execute them would be a breach by the class members.

Although, as the class members point out, the supplements were also designed to prevent future disputes and as such they presumably benefit TCO, we are convinced that on balance the obligation to execute the supplemental contracts is not sufficient to make the settlement agreement executory.  Like the releases, the contract supplements were conditions to the class members' receipt of their portion of the settlement fund. Any class member's failure to execute the supplement would not constitute a breach of the settlement agreement.[20]

---

[20]. The facts here are readily distinguishable from those in Sharon Steel, in which we found an executory contract existed and observed: "The agreement is characterized by reciprocal obligations continuing into the future: National Fuel has promised to provide natural gas to Sharon, and Sharon has promised to purchase the gas at a certain price . . . ."  872 F.2d at 39.  This met the bankruptcy definition of executory contract because either side's failure to perform would clearly have been a material breach.  Here, the class members' obligations were merely conditions.  TCO promised to pay an additional $15 million into the escrow account, and the class members' entitlement to those monies was contingent on completion of the releases and supplemental contracts.

The difference between the agreement in Sharon Steel and the agreement here illustrates the importance of the definition of executory contracts for purposes of the Bankruptcy Code.  Absent the limits imposed by Sharon Steel's definition of executory contract, the agreement here might appear executory. But the factual differences between this case and Sharon Steel point out that not every contract that appears executory because it has not been completely performed is executory for purposes of § 365.  See Countryman, supra, at 450 ("All contracts to a

C.

An examination of the purpose of § 365 leads to the same result. The only functional difference between assumption and rejection in this case, were the contract to be considered executory, is that assumption would give the class a higher priority to the unpaid $15 million. In return TCO would gain nothing of value: the releases add no rights to the estate not already given by the district court's order, and the supplements provide only a marginal benefit to TCO. The Ohio District Court's order bound the class as a whole. Once the order became final and unappealable, all the class members were bound by it. Accordingly, the class members' failure to complete the tasks required for them to receive their money could not breach the agreement between the class and TCO, but could only serve as the failure of conditions precedent to their right to settlement monies. Assumption would not add assets to the bankruptcy estate. See In re Sudbury, Inc., 153 B.R. at 778-81 (holder unjustified in seeking first priority through executory contract provisions when pre-petition claim was not entitled to priority as administrative expense pursuant to 11 U.S.C. § 503). The agreement is not an executory contract for purposes of § 365.

V.

(..continued)
greater or less extent are executory. When they cease to be so, they cease to be contracts. But that expansive meaning can hardly be given to the term as used in the Bankruptcy Act
. . . ." (citation omitted)).

For the reasons set forth, we will affirm the judgment of the district court.