**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

No. 08-1872

———————

In re:  EXIDE TECHNOLOGIES,

                                        Debtors


ENERSYS DELAWARE, INC., formerly known as
EnerSys Inc.,

                                        Appellant.

———————

On Appeal from the United States District Court
for the District of Delaware
(D. C. No. 1-06-cv-00302)
District Judge:  Hon. Sue L. Robinson

———————

Argued on May 12, 2009


Before:  AMBRO, ROTH and ALARCÓN*, Circuit Judges

(Opinion filed: June 1, 2010 )

Robert Lapowsky, Esquire **(Argued)**
Neil C. Schur, Esquire
Stevens & Lee, P. C.
1818 Market Street, 29th Floor
Philadelphia, PA   19104

Joseph Grey, Esquire
Stevens & Lee, P. C.
1105 North Market Street, 7th Floor
Wilmington, DE   19801

                Counsel for Appellant Enersys Delaware, Inc.


Laura Davis Jones, Esquire
James O'Neill, Esquire
Pachulski, Stang, Ziehl & Jones, LLP
919 North Market Street, 17th Floor
P. O. Box 8705
Wilmington, DE   19899-8705

---

*Honorable Arthur L. Alarcón, Senior United States Circuit Judge for the Ninth Circuit, sitting by designation.

Matthew N. Kleiman, Esquire **(Argued)**
Matthew N. Kleiman, P. C.
2506 North Clark Street, Suite 307

2

Chicago, IL   60614

Roger P. Furey, Esquire
John P. Sieger, Esquire
Andrew L. Wool, Esquire
Katten, Muchin, Rosenman, LLP
2900 K Street NW, Suite 200
Washington, DC   20007-5118

Counsel for Appellee Exide Technologies

O P I N I O N

**ROTH,** <u>Circuit Judge</u>:

This case presents the question whether the parties' Agreement is an executory contract.  EnerSys Delaware, Inc., appeals the judgment of the District Court, which affirmed the Bankruptcy Court's order that the Agreement was an executory contract, subject to rejection under 11 U.S.C. § 365(a), and that Exide Technologies could reject it.  We conclude, however, that EnerSys has substantially performed the Agreement.  As a result, EnerSys does not have any unperformed material obligations that would excuse Exide from performance.  We hold, therefore, that the Agreement is not an executory contract. We will vacate the District Court's order and remand this case to the District Court with instructions to remand it to the Bankruptcy Court for further proceedings consistent with this

3

opinion.

## I. BACKGROUND

### A. Factual background

On April 15, 2002, Exide filed a voluntary petition for bankruptcy protection under Chapter 11 of the Bankruptcy Code, 11 U.S.C § 1101, *et seq.* After filing for bankruptcy, Exide sought to reject various agreements that it had with EnerSys arising from their June 1991 transaction. In June 1991, Exide sold substantially all of its industrial battery business to EnerSys for about $135 million.[1] The assets that Exide sold to EnerSys included physical manufacturing plants, equipment, inventory, and certain items of intellectual property. To formalize the sale, Exide and EnerSys entered into over twenty-three agreements. Four of these agreements constitute the crux of the dispute: (1) the Trademark and Trade Name License Agreement, (2) the Asset Purchase Agreement, (3) the Administrative Services Agreement, and (4) a letter agreement. The Bankruptcy Court held, in an order predating the order challenged here, that the four agreements constituted a single integrated Agreement (the Agreement). *In re Exide Techs.*, 340 B.R. 222, 227 (Bankr. D. Del. 2006). Neither Exide nor EnerSys have challenged this determination. We therefore take the next step of determining whether the Agreement is an executory contract.

---

[1] EnerSys was known then as Yuasa Battery (America), Inc.

4

Under the Agreement, Exide licensed its "Exide" trademark to EnerSys for use in the industrial battery business. Exide wanted to continue to use the Exide mark outside of the industrial battery business. To accommodate the needs of both parties, Exide granted EnerSys a perpetual, exclusive, royalty-free license to use the Exide trademark in the industrial battery business. This division worked, and, for almost ten years, each party appeared satisfied with the results of the transaction.

In 2000, however, Exide expressed a desire to return to the North American industrial battery market. After the parties agreed to the early termination of a ten-year noncompetition Agreement (thus granting Exide permission to reenter the market), Exide made several attempts to regain the trademark from EnerSys, but EnerSys refused. Exide wanted to regain the mark as a part of its strategic goal to unify its corporate image. Exide hoped to use a single name and trademark on all the products that it produced; this single name and trademark were, naturally, "Exide."

Exide reentered the industrial battery business by purchasing GNB Industrial Battery Company. Exide, however, remained bound by the ongoing obligation to forbear from using the Exide trademark in that business for as long as the license continued in effect. Thus, from 2000 until Exide filed for bankruptcy protection in 2002, Exide was forced to compete directly against EnerSys, which was selling batteries under the name "Exide." Then, when Exide filed for bankruptcy under Chapter 11, Exide was presented the opportunity to try to regain the Exide trademark by rejecting the Agreement. Exide sought the Bankruptcy Court's approval to do so.

## B. Bankruptcy and District Court Proceedings

On April 3, 2006, the Bankruptcy Court entered an order granting Exide's motion to reject the Agreement. The court held that the Agreement was an executory contract, subject to rejection under 11 U.S.C. §365(a), and that rejection terminated Exide's obligations under it. About three months later, on July 11, the Bankruptcy Court entered an order approving the transition plan and denying EnerSys's motion to stay. EnerSys appealed these two orders to the District Court. The District Court, on February 27, 2008, affirmed the Bankruptcy Court's orders.

EnerSys appeals the District Court's order, arguing two issues: (1) the District Court erred in holding that Agreement was an executory contract, and (2) it erred in holding that rejection terminates EnerSys's rights under the Agreement.

## II. DISCUSSION

The Bankruptcy Court had jurisdiction under 28 U.S.C. §§ 157(a) and 1334(b). The District Court had jurisdiction to decide EnerSys's appeal under 28 U.S.C. §158(a). We have jurisdiction under 28 U.S.C. §§ 158(d) and 1291 to review the District Court's final order.

We exercise plenary review of an order from a district court sitting as an appellate court in review of a bankruptcy court. *E.g.*, *In re CellNet Data Sys., Inc.*, 327 F.3d 242, 244 (3d

Cir. 2003). We will review both courts' legal conclusions *de novo. Id.*; *In re Gen. DataComm Indus., Inc.*, 407 F.3d 616, 619 (3d Cir. 2005). Furthermore, we will set aside a bankruptcy court's factual findings only if clearly erroneous. *In re CellNet Data*, 327 F.3d at 244. For mixed questions of law and fact, we will engage in "a mixed standard" of review, "affording a clearly erroneous standard to integral facts, but exercising plenary review of the lower court's interpretation and application of those facts to legal precepts." *Id.*

## A. Executory contract

The policy behind Chapter 11 of the Bankruptcy Code is the "ultimate rehabilitation of the debtor." *Nichols v. United States*, 384 U.S. 678, 687 (1966). The Code therefore allows debtors in possession, "subject to the court's approval, . . . [to] reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). But the Bankruptcy Code does not define "executory contract." Relevant legislative history demonstrates that Congress intended the term to mean a contract "on which performance is due to some extent on both sides." H.R. Rep. No. 95–595, 347 (1977); *see In re Columbia Gas Sys. Inc.*, 50 F.3d 233, 238 (3d Cir. 1995).

With congressional intent in mind, this Court has adopted the following definition: "'An executory contract is a contract under which the obligation of both the bankrupt and the other party to the contract are so far underperformed that the failure of either to complete performance would constitute a material breach excusing the performance of the other.'" *In re Columbia Gas*, 50 F.3d at 239 (alteration omitted) (quoting *Sharon Steel*

7

*Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36, 39 (3d Cir.1989)).[2]  "Thus, unless both parties have unperformed obligations that would constitute a material breach if not performed, the contract is not executory under § 365." *In re Columbia Gas*, 50 F.3d at 239.  The party seeking to reject a contract bears the burden of demonstrating that it is executory. And "[t]he time for testing whether there are material unperformed obligations on both sides is when the bankruptcy petition is filed."  *Id.* at 240.  Finally, to conduct this determination, we "consider contract principles under relevant nonbankruptcy law." *Id.* at 240 n.10; *see In re Gen. DataComm*, 407 F.3d at 623.  New York, because it is the forum selected in the Agreement's choice-of-law provision, provides the relevant nonbankruptcy law.

Accordingly, our inquiry is to determine whether the Agreement, on April 15, 2002, contained at least one obligation for both Exide and EnerSys that would constitute a material breach under New York law if not performed.  If not, then the Agreement is not an executory contract.[3]  *See In re Gen. DataComm*, 407 F.3d at 623.

---

[2]Professor Vern Countryman, a leading bankruptcy scholar, created and advocated this definition in a law-review article. *See Sharon Steel Corp.*, 872 F.2d at 39 (citing Countryman, *Executory Contracts in Bankruptcy: Part I*, 57 Minn. L. Rev. 439 (1973)).

[3] There is no remaining contention made that Exide had any unperformed obligations.

8

Under New York law, a material breach, which "justif[ies] the other party to suspend his own performance," is "a breach which is so substantial as to defeat the purpose of the entire transaction." *Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 895 (2d Cir. 1976) (citation omitted); *see In re Lavigne*, 114 F.3d 379, 387 (2d Cir. 1997):

> [U]nder New York law, only a breach in a contract which substantially defeats the purpose of that contract can be grounds for rescission. The non-breaching party will be discharged from the further performance of its obligations under the contract when the breach goes to the root of the contract.

*Id.* (internal quotation marks omitted).

But when a breaching party "has substantially performed" before breaching, "the other party's performance is not excused." *Hadden v. Consolidated Edison Co.*, 312 N.E.2d 445, 449 (N.Y. 1974); *see Merrill Lynch & Co. Inc., v. Allegheny Energy, Inc.*, 500 F.3d 171, 186 (2d Cir. 2007).

New York's high court has instructed how to determine when a party has rendered substantial performance:

> There is no simple test for determining whether substantial performance has been rendered and several factors must be considered, including the ratio of the performance already rendered to that

9

unperformed, the quantitative character of the default, the degree to which the purpose behind the contract has been frustrated, the willfulness of the default, and the extent to which the aggrieved party has already received the substantial benefit of the promised performance.

*Hadden*, 312 N.E.2d at 449. "The issue of whether a party has substantially performed is usually a question of fact and should be decided as a matter of law only where the inferences are certain." *Merrill Lynch & Co. Inc.*, 500 F.3d at 186 (citing *Anderson Clayton & Co. v. Alanthus Corp.*, 457 N.Y.S.2d 578, 579 (App. Div. 1983)).

The Bankruptcy Court here failed to properly measure whether either party had substantially performed. Our inspection of the record, however, reveals that the inferences are clear that EnerSys has substantially performed. Applying *Hadden*'s balancing test, EnerSys's performance rendered outweighs its performance remaining and the extent to which the parties have benefitted is substantial. Specifically, EnerSys has substantially performed by paying the full $135 million purchase price and operating under the Agreement for over ten years. EnerSys has been producing industrial batteries since 1991, using all the assets transferred under the Agreement, including real estate, real-estate leases, inventory, equipment and the right to use the trademark "Exide." Moreover, EnerSys has provided Exide with the substantial benefit of assuming the latter's liabilities, including numerous contracts and accounts receivable, within the business EnerSys purchased.

10

Exide argues that EnerSys's ongoing, unperformed obligations outweigh its performance. It relies on the following four obligations of EnerSys: (1) an obligation to satisfy the Quality Standards Provision, and obligations to observe (2) the Use Restriction, (3) the Indemnity Obligations, and (4) the Further Assurances Obligations.[4] We reject Exide's argument; these four obligations do not outweigh the substantial performance rendered and benefits received by EnerSys.

First, EnerSys's obligation to observe the Use Restriction, *i.e.*, not to use the Trademark outside the industrial battery business, is not a material obligation because it is a condition subsequent that requires EnerSys to use the mark in accordance with the terms of the Trademark Licence. A condition subsequent is not a material obligation. *See In re Columbia Gas System, Inc.*, 50 F.3d 233, 241 (3d Cir. 1995) ("Non-occurrence of a condition is not a breach by a party unless he is under a condition that the condition occur." (quoting RESTATEMENT (SECOND) OF CONTRACTS § 225(3) (1981)). Moreover, the Use Restriction does not relate to the purpose of the Agreement – which is that Exide would transfer its industrial battery business and the concomitant assets and liabilities to EnerSys and EnerSys in exchange would pay Exide about $135 million. Therefore, even if the obligation were not a condition subsequent, it nevertheless would not affect the substantial performance of the Agreement.

---

[4] Exide does not argue in its Brief that other obligations, set out by the Bankruptcy Court, such as the pension obligation, are substantially unperformed.

11

Second, EnerSys's obligation to observe the Quality Standards Provision is minor because it requires meeting the standards of the mark for each battery produced; it does not relate to the transfer of the industrial battery business. Furthermore, the record reveals that Exide never provided EnerSys with any quality standards. (J.A. 297.) The parties, in fact, do not ever seem to have discussed any such standards. (*See id.* at 321–22.) It is an untenable proposition to find an obligation to go to the very root of the parties' Agreement when the parties themselves act as if they did not know of its existence.

Finally, the other two obligations that Exide argues are substantial, the Indemnity Obligation and the Further Assurances Obligation, do not outweigh the factors supporting substantial performance. In regard to the Indemnity Obligation, under the Asset Purchase Agreement, all representations and warranties arising from it expired in 1994, on the third anniversary of the closing and Exide did not present any evidence that any liability assumed by EnerSys was still pending. Similarly, under the Further Assurances Obligation, EnerSys agreed to cooperate to facilitate the 1991 transaction. Exide has identified no remaining required cooperation.

Exide argues, however, citing *Hadden*, that the substantial-performance doctrine is "irrelevant here" because it applies only in cases involving construction or employment contracts. *See Hadden*, 312 N.E.2d at 449. Our review of New York law reveals that no New York court has held (or even intimated, *see id.*) that the doctrine should be confined to the construction/employment contract areas. Indeed, the Second

12

Circuit Court of Appeals, applying New York law, recently applied *Hadden*'s substantial-performance doctrine in a $490 million asset-purchase contract that formalized the sale of an energy trading commodities business to a larger energy business. *See Merrill Lynch*, 500 F.3d at 186. That contract was neither a construction nor employment contract. We also now conclude that we will not confine the doctrine to construction and employment contract cases.

### III.  <u>CONCLUSION</u>

For the reasons stated above, we have determined that the Agreement is not an executory contract because it does not contain at least one ongoing material obligation for EnerSys. Because the Agreement is not an executory contract, Exide cannot reject it. We will vacate the District Court's order and remand this case to it for remand to the Bankruptcy Court for further proceedings consistent with this opinion.

In Re: Enersys Delaware, Inc.
No. 08-1872

---

AMBRO, <u>Circuit Judge</u>, concurring

I join Judge Roth's opinion in full, and write separately to address the Bankruptcy Court's determination, adopted by the District Court, that "[r]ejection of the Agreement leaves EnerSys without the right to use the Exide mark." *In re Exide Techs.*, 340 B.R. 222, 250 (Bankr. Del. 2006). I disagree with that determination, as I believe a trademark licensor's rejection of a trademark agreement under 11 U.S.C. § 365 does not necessarily deprive the trademark licensee of its rights in the licensed mark.

In *Lubrizol Enterprises, Inc. v. Richmond Metal Finishers, Inc.*, 756 F.2d 1043 (4th Cir. 1985), *cert. denied*, 475 U.S. 1057 (1985), a licensor, Richmond Metal Finishers, granted a nonexclusive technology license to Lubrizol. The license stated that Richmond and Lubrizol owed each other certain duties. *See id.* at 1045. Shortly thereafter, Richmond filed for bankruptcy protection and sought to rescind the license by rejecting it under § 365. The Fourth Circuit Court granted this request and "deprive[d] Lubrizol of all rights" under the license:

> Under 11 U.S.C. § 365(g), Lubrizol would be entitled to treat rejection as a breach and seek a money damages remedy; however, it could not seek to retain its contract rights in the technology by specific performance even if that remedy would ordinarily be available upon breach of this type of contract.

*Id.* at 1048. The Court acknowledged that this interpretation of rejection as a termination "could have a general chilling effect upon the willingness of . . . parties to contract at all with businesses in possible financial difficulty." *Id.* "But," it said, "under bankruptcy law such equitable considerations may not be indulged by courts in respect of the type of contract here in issue." *Id.*

Reacting to industry concerns that "after *Lubrizol* any patent or trademark licensor could go into Chapter 11 and invalidate a license perfectly valid under contract law," Congress enacted 11 U.S.C. § 365(n). Jay Lawrence Westbrook, *A Functional Analysis of Executory Contracts*, 74 Minn. L. Rev. 227, 307 (1989). Through this provision, Congress sought "to make clear that the rights of an intellectual property licensee to use the licensed property cannot be unilaterally cut off as a result of the rejection of the license pursuant to Section 365 in the event of the licensor's bankruptcy." S. Rep. No. 100-505, at 1 (1988), *reprinted in* 1988 U.S.C.C.A.N. 3200, 3200.

Section 365(n) reads in relevant part:

If the trustee rejects an executory contract under which the debtor is a licensor of a right to intellectual property, the licensee under such contract may elect—

(A) to treat such contract as terminated by such rejection if such rejection by the trustee amounts to such a breach as would

2

entitle the licensee to treat such contract as terminated by virtue of its own terms, applicable nonbankruptcy law, or an agreement made by the licensee with another entity; or

(B) to retain its rights (including the right to enforce any exclusivity provision of such contract, but excluding any other right under applicable nonbankruptcy law to specific performance of such contract) under such contract and under any agreement supplementary to such contract, to such intellectual property . . . , as such rights existed immediately before the case commenced for—

(i) the duration of such contract; and

(ii) any period for which such contract may be extended by the licensee as of right under applicable nonbankruptcy law.

11 U.S.C. 365(n)(1). Thus, in the event that a bankrupt licensor rejects an intellectual property license, § 365(n) allows a licensee to retain its licensed rights—along with its duties—absent any obligations owed by the debtor-licensor.

Congress, however, did not include trademarks within the relevant definition of "intellectual property." Instead, it defined

3

"intellectual property" only to include a:

> (A) trade secret;

> (B) invention, process, design, or plant protected under title 35;

> (C) patent application;

> (D) plant variety;

> (E) work of authorship protected under title 17; or

> (F) mask work protected under chapter 9 of title 17;

> to the extent protected by applicable nonbankruptcy law.

11 U.S.C. § 101(35A).

Because Congress did not protect trademark licensees under § 365(n), courts have reasoned by negative inference that it intended for *Lubrizol*'s holding to control when a bankrupt licensor rejects a trademark license. *See, e.g.*, *In re Old Carco LLC*, 406 B.R. 180, 211 (Bankr. S.D.N.Y. 2009) ("Trademarks are not 'intellectual property' under the Bankruptcy Code . . . [, so] rejection of licenses by [a] licensor deprives [the] licensee of [the] right to use [a] trademark . . . ."); *In re HQ Global Holdings, Inc.*, 290 B.R. 507, 513 (Bankr. D. Del. 2003) ("[S]ince the Bankruptcy Code does not include trademarks in

4

its protected class of intellectual property, *Lubrizol* controls and the Franchisees' right to use the trademark stops on rejection."); *In re Centura Software Corp.*, 281 B.R. 660, 674–75 (Bankr. N.D. Cal. 2002) ("Because Section 365(n) plainly excludes trademarks, the court holds that [the licensee] is not entitled to retain any rights in [the licensed trademarks] under the rejected . . . [t]rademark [a]greement."); *In re Chipwich, Inc.*, 54 B.R. 427, 431 (Bankr. S.D.N.Y. 1985) ("[B]y rejecting the [trademark] licenses[,] the debtor will deprive [the licensee] of its right to use the . . . trademark for its products.").

The Bankruptcy Court here adopted this reasoning:

Congress certainly could have included trademarks within the scope of § 365(n)[,] but saw fit not to protect them. Therefore, the holding in [*Lubrizol v.*] *Richmond Metal Finishers*, as well as the holdings in the other pre and post § 365(n) trademark rejection cases . . . , still retain vitality insofar as they relate to trademark licenses. As a result, a trademark license is terminated upon rejection and the licensee is left only with a claim for damages.

*In re Exide*, 340 B.R. at 250 n.40.

But while the Supreme Court has endorsed reasoning from negative inference in the context of § 365, *see NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 522–23 (1984) (holding that § 365(a) applied to collective-bargaining agreements covered by the National Labor Relations Act because Congress failed to

5

draft an exclusion for them), I believe such reasoning is inapt for trademark license rejections.

When Congress enacted § 365(n), it explicitly explained why it excluded trademark licensees from the protection afforded to "intellectual property" licensees:

> [T]he bill does not address the rejection of executory trademark, trade name or service mark licenses by debtor-licensors. While such rejection is of concern because of the interpretation of section 365 by the *Lubrizol* court and others, *see, e.g.*, *In re Chipwich, Inc.*, 54 Bankr. Rep. 427 (Bankr. S.D.N.Y. 1985), such contracts raise issues beyond the scope of this legislation. In particular, trademark, trade name and service mark licensing relationships depend to a large extent on control of the quality of the products or services sold by the licensee. Since these matters could not be addressed without more extensive study, it was determined to postpone congressional action in this area and to allow the development of equitable treatment of this situation by bankruptcy courts.

S. Rep. No. 100-505, at 5, *reprinted in* 1988 U.S.C.C.A.N. at 3204. "Nor does the bill address or intend any inference to be drawn concerning the treatment of executory contracts which are

unrelated to intellectual property." *Id.*[1]

In light of these direct congressional statements of intent, it is "simply more freight than negative inference will bear" to read rejection of a trademark license to effect the same result as termination of that license. Michael T. Andrew, *Executory Contracts Revisited*, 62 U. Colo. L. Rev. 1, 11 (1991). "[T]he purpose of § 365" is not "to be the functional equivalent of a rescission, rendering void the contract and requiring that the parties be put back in the positions they occupied before the contract was formed." *Thompkins v. Lil' Joe Records, Inc.*, 476 F.3d 1294, 1306 (11th Cir. 2007). It "merely frees the estate from the obligation to perform," and "has absolutely no effect upon the contract's continued existence." *Id.* (internal citations omitted); *see also* 3 *Collier on Bankruptcy* ¶ 365.14 n.3 (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2009) (noting some take the view that "rejection by the debtor terminates the

---

[1] This statement may stem from the recommendation of the National Bankruptcy Conference that "there should be in this legislative history a caveat that makes it clear that no negative inferences are to be drawn or should be drawn by courts that, because Congress has legislated in a particular way a licensing agreement, those other agreements that are not within the parameters of the legislation are to be dealt with in any particular way." *Intellectual Property Contracts in Bankruptcy: Hearing on H.R. 4657 Before the Subcomm. on Monopolies and Commercial Law of the H. Comm. on the Judiciary*, 100th Cong. 101 (1988) (statement of George Hahn, Esq., Representative, National Bankruptcy Conference).

7

rights of the other parties to the contract as opposed to being simply a determination not to perform, more in the nature of an abandonment, which was the intellectual source of the rejection concept"); 2 *Norton Bankruptcy Law and Practice* § 46:57 (3d ed. 2008) ("The Bankruptcy Code instructs us that rejection is a breach of the executory contract. It is not avoidance, rescission, or termination." (footnotes omitted)).

By permitting Exide to "extinguish[]" EnerSys's right in the "Exide" mark through § 365 rejection, the Bankruptcy and District Courts failed to follow this path. Rather than reasoning from negative inference to apply another Circuit's holding to this dispute, the Courts here should have used, I believe, their equitable powers to give Exide a fresh start without stripping EnerSys of its fairly procured trademark rights. *Cf. In re Matusalem*, 158 B.R. 514, 521–22 (Bankr. S.D. Fla. 1993) (suggesting that rejection of a trademark license would not deprive a licensee of its rights in the licensed mark).

Courts may use § 365 to free a bankrupt trademark licensor from burdensome duties that hinder its reorganization. They should not—as occurred in this case—use it to let a licensor take back trademark rights it bargained away. This makes bankruptcy more a sword than a shield, putting debtor-licensors in a catbird seat they often do not deserve.