In re The PHOENIX, LTD., t/a
Chequers, Ltd., Debtor.

Jerome A. POOLE, William L.
Curry, and The Phoenix, Ltd.,
t/a Chequers, Ltd., Appellants

v.

C. Glen DUGDALE, Appellee.

Bankruptcy No. 85–452.
Civil Action No. 96–507–RRM.

United States District Court,
D. Delaware.

July 25, 1997.

Wayne J. Carey, Heather D. Jefferson, Esquire, Prickett, Jones, Elliott, Kristol & Schnee, Wilmington, DE, for Appellants.

Robert D. Goldberg, Biggs & Battaglia, Wilmington, DE, for Appellee.

**58**

## OPINION

McKELVIE, District Judge.

This is a bankruptcy case. The debtor is The Phoenix, Ltd., a corporation that once operated Chequers, Ltd., a men's clothing store in Wilmington, Delaware. Jerome A. Poole and William L. Curry are the shareholders of The Phoenix, having purchased their stock from C. Glen Dugdale and William K. Dugdale in April 1984.

In November 1985, Poole and Curry filed on behalf of The Phoenix a petition with the United States Bankruptcy Court for the District of Delaware seeking protection under Chapter 11, Title 11 of the United States Code. In December 1985, Poole, Curry, and The Phoenix filed an adversary proceeding against the Dugdales and their former accountant George H. Skinner. Poole and Curry alleged that in connection with the negotiations that led to their purchase of the stock, the Dugdales misrepresented the corporation's assets and liabilities and Skinner prepared financial statements that were not accurate.

In their complaint, Poole and Curry sought an order rescinding and setting aside the transaction. They also sought damages for breach of warranty, and compensatory and punitive damages for alleged fraud and negligence.

In their answer to the complaint, defendants denied liability and asserted affirmative defenses of laches, estoppel, and waiver based on the plaintiffs' alleged delay in failing to notify them of the alleged misrepresentations of assets and liabilities.

This case was tried to the bankruptcy court in December 1987. In a Memorandum Opinion and Order dated June 12, *1996* (yes, 1996), the bankruptcy court found that plaintiffs had failed to prove that defendants had breached tort or contract duties and that plaintiffs were not, therefore, entitled to legal or equitable relief. In addition, the court ordered that judgment on the affirmative defense of laches be entered in favor of defendants.

Poole, Curry, and The Phoenix have appealed. This is the court's decision on their appeal, after briefing and oral argument.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The following summary of facts is based on the testimony and documents admitted into evidence at the trial on December 16–18, 1987.

### A. The Negotiations Leading Up to the Agreement

In January 1984, Glen Dugdale and his brother William decided to sell Chequers, a men's clothing store that they owned and operated on the Market Street Mall in Wilmington. They had started the business in 1973, and it had been only modestly successful since then.

Glen offered to sell the business to Mark Undorf, the store manager, but Undorf was not interested. He offered it to John Suder, a salesman at the store, and Suder was interested. Suder approached Jerome Poole and William Curry about joining him in buying the business. Curry and Poole were interested. As part of their review of the business, they asked for and received Chequers' financial statements for the years ending August 31, 1981, 1982, and 1983, all of which were prepared by George H. Skinner, a certified public accountant with offices in Newark, Delaware.

The August 31, 1983 financial statement is a compilation. In a cover letter dated November 29, 1983, Skinner wrote:

A compilation is limited to presenting in the form of financial statements information that is the representation of management. I have not audited or reviewed the accompanying financial statements, and accordingly, do not express an opinion or any other form of assurances on them.

Management has elected to omit substantially all of the disclosures and the statement of changes in financial position required by generally accepted accounting principles. If the omitted disclosures were included in the financial statements, they might influence the user's conclusions

about the Company's financial position, results of operations, and changes in financial position. Accordingly, these financial statements are not designed for those who are not informed about such matters.

The financial statement shows that as of August 31, 1983, Chequers had $8,337.34 in cash, $14,784.77 in accounts receivable, and $107,798.00 in inventory. It reported fixed assets with a book value of $16,713.24. (These assets were primarily leasehold improvements to the store. The $16,713.24 reflects an initial investment of $67,575.96, less accumulated depreciation of $50,862.72.) The financial statement showed current liabilities of $70,410.54, including withholding taxes payable, gift certificates and credits, a note payable in the amount of $66,520.95, and accounts payable of $1,228.54.

In January and February 1984, while Glen Dugdale was negotiating the sale of the store, he oversaw a more extensive than usual end-of-season sale of clothes. At the end of February, Suder and Undorf conducted a review of the store's inventory. They worked through the stock of clothes one item at a time. Suder would identify and call out to Undorf the item and its retail sales price. Undorf recorded the information on an inventory list. The summary Suder and Undorf prepared initially stated the value of the inventory at $130,000, which was the total value of the inventory stated at retail selling prices rather than at cost.

In early March, Suder asked Alice Deese, Chequers' bookkeeper, to prepare an updated summary of the store's accounts payable. She prepared and gave to Suder a summary showing that payables were in the range of $2,000.

In mid-March, Poole, Curry, and Suder agreed with the Dugdales on a purchase price of $84,000 for the business, with the settlement to be held in mid-April. Once the parties agreed on a purchase price, Suder took over management of the store. Undorf resigned April 1st. By Friday, April 13, the purchaser's lawyer, Gene DiPrinzio, had prepared and circulated a draft agreement.

**B.** *April 16, 1984 Agreement for the Purchase of Stock*

The settlement on the sale was held on Monday, April 16th. Glen Dugdale appeared at the settlement and was not represented by counsel. (William Dugdale was not present and signed the documents at a later date.) During the settlement, the buyers learned of a $10,000 letter of credit that was not reported on the store's financial statement. Curry, Poole, and Suder agreed with Dugdale that they would pay off this debt with the proceeds from the sale and reduce the net amount that would otherwise be paid to the Dugdales.

The agreement signed by the parties included the following representations and warranties:

4. *Sellers' Representations and Warranties.* Sellers, jointly and severally, represent and warrant as follows:

\* \* \* \* \* \*

(h) The Corporation has delivered to Buyers copies of the following financial statements: unaudited financial statements for the year ended August 31, 1983 (the "Financial Statements"). The Financial Statements, including the notes related thereto, represent assets, liabilities and financial condition of the Corporation as of the date thereof and the results of its operations for the period ended at the date thereof prepared in conformity with generally accepted accounting principles consistently applied throughout the periods involved consistent with preceding periods.

(I) Since April 1, 1984, there has not been (1) any change in the assets, liabilities, business or financial condition of the Company other than changes in the ordinary course of business, which, in the aggregate, have not been materially adverse, or (2) any damage, destruction, casualty or loss materially and adversely affecting the business or property of the Corporation except damages ·or losses covered by insurance.

(j) Except and to the extent the accounts payable at August 31, 1983 and listed in Exhibit B or as reflected in or

reserved against the Corporation's Financial Statement, the Corporation has no liabilities or obligations of any nature, whether accrued, absolute, contingent, due or to become due or otherwise, including, without limitation, tax liabilities, except for liabilities or obligations which arose in the ordinary course of business since August 31, 1983; and all liabilities, including without limitation all accounts payable and all payroll or withholding taxes, due or accrued up to and including the Closing Date will as of the Closing Date been paid or sufficient reserves have been established therefor.

\* \* \* \* \* \*

(m) Sellers' representations and warranties contained in this Agreement shall be deemed to have been made again at Closing and as of the Closing Date and shall then be true, accurate, and complete in all material respects.

The agreement included the following provision on indemnification:

8. *Indemnification.* Sellers jointly and severally agree to indemnify and hold harmless Buyers against and in respect to any loss, cost, expense (including, without limitation, reasonable attorneys' fees), or other damage suffered by Buyers resulting from, arising out of or incurred with respect to (I) the falsity or breach of any representation, warranty or covenant made by Sellers herein or in any document delivered by Sellers at the Closing, or (ii) any claim made by a third party or suit or other proceeding commenced by any such party alleging facts which, if true, would entitle Buyers to indemnification pursuant to clause (I) above. Moreover, Buyers shall have the right pending Closing to set-off against the monies due under the Note pursuant to § 2 of this Agreement, any amount of financial loss or other damage incurred by Buyers incident to their operation and management of the retail clothing business known as Chequers Ltd. pending Closing.

## C. Buyers Discover Additional Payables

Prior to the settlement, Poole and Curry understood that the store's payables were in the range of $1,200 to $2,000. Two weeks after the settlement, Poole and Curry received a document showing that balance due on the accounts payable was $29,177.26. Poole and Curry later testified that they were surprised by this figure, as prior to the settlement they had repeatedly asked Glen Dugdale for confirmation of the business' payables and he had assured them that they were less than $2,000. Nevertheless, they decided not to confront the Dugdales with this discrepancy and instead moved on with the business.

That spring, Alice Deese resigned as the bookkeeper and was replaced by Bonnie Wilson; Curry, Poole, and Suder hired Kenneth Stewart as the business' accountant.

In August, Suder prepared a second inventory. He again reviewed and listed the clothing at retail rather than at cost. He gave this information to Stewart, who incorporated it in the annual statement for 1984, showing a value for the store's inventory of $150,254.75.

By May 1985, Curry and Poole had discovered that there was not sufficient cash flow to pay current bills and that Suder had been putting certain invoices in a drawer. Suder left the business that month and Curry and Poole bought out his interest in the business for $10.00.

## D. Buyers Learn Inventory Value Overstated

In June, Curry and Poole hired another accountant, Charles Seitz, to review the books and prepare an inventory analysis. In preparing a compilation for the period ending May 31, 1995, Seitz discovered that the value of the August 31, 1984 inventory had been overstated by approximately $75,000 and that the accounts payable had been understated by $30,000. After further investigation, Seitz determined that the August 1984 inventory had been stated at retail rather than cost.

## E. Poole and Curry File Petition Under Chapter 11 and Close the Store

In November 1995, Poole and Curry filed a voluntary petition to bring the corporation

under Chapter 11. In December, they sued Glen and William Dugdale and Skinner.

In their complaint, Poole and Curry alleged that the Dugdales fraudulently induced them into buying the business by materially misstating the value of the inventory and the amount of the payables. They also alleged that Skinner negligently misrepresented the value of the business by preparing and distributing financial statements that set out the value of inventory at retail rather than at cost. They sought an order rescinding the agreement, indemnification under the contract, and compensatory and punitive damages.

In January 1986, the Dugdales and Skinner answered the complaint by denying liability and asserted affirmative defenses of laches, estoppel, and waiver. At the end of that month, Poole and Curry closed Chequers.

### F. *The Trial*

This case was tried to the bankruptcy court from Monday, December 16 through Wednesday, December 18, 1987. At trial, Poole and Curry testified about the negotiations that led up to their purchase of the business, what happened at the settlement, and what they discovered after the settlement. For example, Poole testified as follows:

Q. Now, Mr. Poole, in addition to these three financial statements, Plaintiff's 1 through 3, was there any other information provided to you during the negotiations for the purchase of the stock?

A. No.

Q. Well, did you make any further inquiries?

A. Certainly, yes, we did.

Q. And what where those inquiries?

A. Well, as I mentioned, we made inquiries for the payables on a regular basis.

Q. And what was the answer, response to that?

A. We were told that we would get them, however, they aren't together but they are appreciably the same as the year ends of 1983.

Q. And do you recall—well, you said in the record that was about $1,200, is that what your understanding of the accounts payable balance?

A. Yes. Even at settlement that was brought up and that specific figure was referred to at settlement.

 * * * * * *

Q. Were there any representations made to you with respect to inventory of the store?

A. I was told that inventory was appreciably the same.

Q. As what?

A. As the year end financials of '83.

Q. Is that the $107,000?

A. Yes.

Q. Was it ever revealed to you—let me rephrase that, was any information ever revealed to you as to the methodology used at Chequers for valuing or counting accounts payable?

A. None.

Q. Was any information ever revealed to you with respect to the practices at Chequers with respect to valuing or reporting on the financial statements inventory numbers?

A. No. My assumption was that they used general accounting principals [sic].

Mr. Curry testified:

A. Well, we had been asking for payables for numerous times and never seemed to be able to get them, and when this came up, my alarm signals went off inside of me and I just was concerned. I was assured by Glen that was not a problem, that there were no future payables. At the very outside his words were—at the very outside his words were it was less than two thousand, it couldn't be $1,800. I then was—

Q. Now, that representation was as to what?

A. The payables, the obligation of Chequers' payables.

Q. And it was made to you when?

A. At settlement. Then there was a discussion of the guarantees that they were rendering in the contract. Our attorney, I don't know whether was it Bob Thomas or Gene DiPrinzio, he told Jerry and I both that Glen was warranting the financials. And they explained the warranting to Glen and everything was acceptable and we proceeded forward.

Plaintiffs also called Charles Seitz, who testified to his review of the store's financial records and his conclusion that the value of inventory had been stated at retail rather than at cost in the financial statements since at least 1980.

The parties each called expert witnesses to testify with regard to whether Skinner had breached a duty of care in preparing and distributing the financial statements. Plaintiffs called John Markowski, a certified public accountant. He testified that Skinner should have been aware that the inventory was being reported at retail rather than at cost, and that he should have been aware that the Dugdales were not reporting certain payables on the financial statements. He offered his opinion that these practices were not in accordance with generally acceptable accounting principles.

Defendants called Frederic Stiner, a certified public accountant who teaches at the University of Delaware. Stiner spoke to the inventory issue. He reviewed the financial statements and certain facts relating to the financial history of the business and testified that he could find no basis in fact for concluding that the financial reports had stated inventory at retail rather than at cost.

The defense then called John Suder, Mark Undorf, and Glen Dugdale. Undorf offered the following testimony, which was generally confirmed by Suder and Glen Dugdale. While he was at Chequers, he, Suder, and Glen Dugdale looked to three types or categories of inventory. First, they had inventory on the sales floor. When he was manager, he was responsible for preparing a semi-annual summary of this inventory. While Suder was there, he and Suder would do the inventory by working through each item or category of items. They recorded the unit item and the retail sales price on a list. Generally, the total retail value would be in the range of $150,000. After taking the inventory, Undorf would give the list to Glen Dugdale.

The store had a second category of inventory, which they called "inventory carry forward." That inventory would be received and held in boxes at the store for display and sale later. Undorf did not count these items and they were not, therefore, on his list.

A third category of inventory was out-of-season inventory. At the end of a season and after a sale, they would pack up certain clothes and take them to be stored at Glen Dugdale's house. Undorf estimated that at any given time the cost (as opposed to retail value) of those items would be in the range of $30,000.

Dugdale testified that at any given time he had approximately $20,000 to $30,000 of out-of-season clothes valued at cost stored at his house. When he prepared information for Skinner on inventory, he would take the list from Undorf on inventory on display at the store, convert the numbers from retail to cost, add the value at cost of the items he stored at his house, and give the revised figure to Skinner.

Dugdale testified that he did not include the carry-forward inventory in boxes at the store in the numbers he gave to Skinner, nor did he include the bills for these clothes in the accounts payable. He estimated that at any given time the carry-forward inventory would have a value at cost in the range of $5,000.

Suder offered the following testimony describing the inventory he took on March 1, 1984. The summary of that inventory, marked and admitted as Defendants' Exhibit No. 11, identified clothing with a total value at cost of $66,047.60.

Q. I have placed before you what is Defendant's Exhibit No. 11 and ask you if you can identify that?

A. This is the final data sheets of the inventory taken March 1, 1984.

Q. And do you remember taking that inventory?

A. Yes.

Q. And can you tell us who assisted you in taking that inventory?

A. Mark Undorf.

Q. And can you tell us what the usual procedure was for taking inventory at Chequers?

A. One person would physically take a piece of merchandise in hand, call out the retail price, the other one would make a slash mark.

Q. And had you assisted or taken inventories previously?

A. Yes.

Q. Can you look at the column on the inventory sheet that has price and above that I think in your handwriting is marked the word cost?

A. Yes.

Q. Is that correct, is this your handwriting?

A. Yes, it is.

Q. Can you tell us why this inventory was taken at cost?

A. It was easy to do the closing at cost because we had a price code on each article of clothing that reflected the actual purchase price. This inventory was taken at cost for clothing to try to reflect a true wholesale price cost.

Q. And the date shown on the top is March 1st, 1984, is that the date that this inventory was taken?

A. Yes.

Q. Can you tell us what you did with the inventory after you took it?

A. With the raw data sheets?

Q. Yes.

A. Transferred them on to these.

Q. So these are actually compiled from raw data sheets?

A. Yes. The raw data sheets would have been pieces from a legal yellow lined pad.

Q. And what did you do with the inventory after you had compiled it from the raw data sheets and placed it on these sheets?

A. I believe I sent a copy to Mr. Dugdale. I know I gave a copy to Mr. Poole and to Mr. Curry.

Q. Was any financial data submitted to the Bank of Delaware regarding the purchase of Chequers?

A. I had one discussion with Mr. Schofield, and I believe during that discussion I delivered financial statements, probably an inventory.

With regard to accounts payable, Dugdale testified that he told Suder in February 1984 to ask Alice Deese to prepare a current summary of payables. Deese testified that she prepared the summary in late February or early March and gave it to Suder. Suder testified that at the time of the sale, Alice Deese gave him a list of the payables and that he had passed that list on to Poole and Curry.

Alice Deese testified to the practice she followed in keeping and reporting information on payables. She testified, for example, that for the August 31, 1983 summary of payables, she did not include the payables for fall clothes that had been received but were not on display on the floor.

Counsel reviewed with Deese the ledgers she had kept at Chequers and attempted to reconstruct the status of Chequers' payables as of August 1983. Deese separated the amounts into categories. First, she identified approximately $13,000 in billings for items where no payment was due (where clothes had, for example, been shipped to another store). Second, she identified approximately $18,600 in invoices for either Fall merchandise, where the clothes were not reported in the inventory and the invoices for the clothes were not included in the list of payables, or for invoices for items received after August 1983. Third, she identified approximately $1,200 as the net total for invoices due as of August 1983. It appears she had concluded that this net total for invoices due had increased to approximately $1,800 by April 1984, and that the difference between this amount and the balance of $29,000 identified by the plaintiffs would be attributable to some portion of the approximately $13,000

the plaintiffs would have included but for which she testified payments were not due, and approximately $17,000 in payables for which there had been an offsetting increase in the value of inventory.

George Skinner testified that he was aware of Chequers' policy of not reporting the carry-forward inventory and the payables for them on current financial statements. He testified this had been a standard practice adopted with the accountant who had prepared the statements before him. He had not changed the practice as he felt the dollars and information were not material. With regard to the valuation of inventory on the reports, he testified that he understood that the information he received from Dugdale and included in the reports showed the value of inventories at cost.

### G. *Post–Trial Proceedings*

The parties completed post-trial briefing on June 10, 1988.

On June 13, 1990, plaintiffs moved to amend their complaint. In their motion they reported that, prior to trial, Skinner filed for protection under Chapter 11 and sought to amend their complaint to add a claim against him alleging fraud, which would be a nondischargeable debt in his bankruptcy. Following oral argument on July 17, 1990, the bankruptcy court denied the motion.

In October 1992, the United States Trustee moved to convert The Phoenix's Chapter 11 case to a Chapter 7 or, alternatively, to dismiss. Counsel for The Phoenix responded by filing a paper reporting that the adversary proceeding was still pending and that if The Phoenix were not successful in this case, it planned on converting the case to Chapter 7.

In December 1992, counsel for The Phoenix filed an application for allowance of compensation. In May 1993, the United States Trustee filed an objection to the fee application.

### H. *Memorandum Opinion and Order*

On June 12, 1996, eight years and six months after trial, the bankruptcy court issued a Memorandum Opinion and Order

finding that plaintiffs had failed to establish a basis for relief. The court also issued a judgment in favor of defendants that plaintiffs' claim to rescind the contract was also barred by laches.

Although the bankruptcy court found that "It is not disputed that in August 1993 the retail value of the inventory was $107,796," in reality, defendants had tried the case on the theory that the retail value of the inventory was *not* $107,796. Their defense rested on the theory that the $107,796 figure in the August 1983 statement was the value of the inventory at cost. Dugdale testified that he gave Skinner inventory figures at cost. Skinner testified he understood he was reporting the figures at cost. And Stiner testified that he understood the numbers were reported at cost. (In fact, at oral argument on appeal, defendants conceded that if the August 1983 statement had reported inventory at retail, then they would have wrongfully misled plaintiffs in the transaction.)

Defendants won anyway on this issue of the value of the inventory, as the bankruptcy court went on to find that Skinner had not given a warranty that the financial statements were prepared in accordance with generally acceptable accounting principles and that "it is nonsensical for the plaintiffs to argue that they should be able to assert a breach of section 4(h) by requiring this compilation to comply with generally accepted accounting principles, when by its terms, it was not."

As to the second issue, the understatement of accounts payable, the bankruptcy court found that defendants had come forward with testimony by Suder confirming that in March 1984 Deese had prepared a summary of payables, had given it to Suder, and that Suder had given it to Curry and Poole. She also found that at trial Deese had fairly explained the differences between the $2,000 number initially given to plaintiffs in March 1984 and the $29,000 amount they discovered soon after the April 1984 settlement.

The bankruptcy court found that, with one exception, the April 1984 payables were in the range of the numbers reported in the August 1983 financial statement. The excep-

tion was that the August 1983 payables did not include amounts due for the inventory that had been received, but not put on the floor. The court found, however, that any increase in the payables for these new clothes would be offset by a comparable increase in the value of inventory, and that this offsetting increase in assets and liabilities would not be material to the transaction.

The court went on to reject plaintiffs' other arguments with regard to the alleged omissions or misstatements relating to the business. The court found that Suder had acted as plaintiffs' agent in the transaction. As Suder was generally aware of how the store was operated and Dugdale's idiosyncrasies in storing and accounting for inventory, and as Suder in fact did the inventory in March, plaintiffs could not establish that they had been misled. Finally, the court found that in light of the general risks in running the business and in light of plaintiffs' delay in asserting these claims, it would be inequitable to allow them to proceed on their claims. Although the court had not found that plaintiffs were otherwise entitled to relief, it nevertheless concluded that defendants had proven laches and entered judgment in their favor on that affirmative defense.

## I. The Appeal

Poole, Curry, and The Phoenix have appealed. They argue that the bankruptcy court erred in failing to grant them relief based on the finding the defendants had reported inventory at retail rather than cost, as that misstatement of the value of the inventory was inconsistent with Standard Accounting Principles and entitled plaintiffs to relief for negligence, fraud, and breach of warranty. They also argue the bankruptcy court erred in concluding Poole and Curry were aware of the amount of Chequers' debts prior to the settlement, and erred in relying on Deese's testimony on the payables that were actually due. They ask this court to enter an order reversing the bankruptcy court, to make findings they are entitled to damages and indemnification, and to enter a judgment in their favor.

## II. DISCUSSION

### 1. Standard and Scope of Review

The bankruptcy court's decision is a final order and this court has jurisdiction to hear the appeal pursuant to 28 U.S.C. § 158. On appeal, the standard of review of questions of law is plenary; the standard of review of findings of fact is whether the bankruptcy court's findings are clearly erroneous. *In re Columbia Gas Sys., Inc.* 50 F.3d 233 (3d Cir.1995).

### 2. Did the Bankruptcy Court Err in Failing to Find the Defendants Liable For Reporting Inventory at Retail Rather than Cost?

██ The parties pretty much agree that the bankruptcy missed the point on the valuation of inventory. The fact in dispute is whether the August 1983 financial statement prepared by Skinner for the Dugdales set out the value of inventory at cost or at retail sales prices. If Skinner and the Dugdales are correct and the statements identify inventory at cost, then the plaintiffs have failed to establish a basis for relief (at least as to the allegations that the financial statements are misleading and not prepared in accordance with generally accepted accounting principles). If plaintiffs are correct and the statement identifies inventory at retail, then defendants concede that plaintiffs would have established a right to relief in that the statement was misleading.

As the bankruptcy court mistakenly believed that this fact was undisputed, this court will reverse the bankruptcy court's order dismissing plaintiffs' claims for relief based on the alleged misstatements as to the value of the inventory.

### 3. Did the Bankruptcy Court Err in Finding that Defendants Did Not Fail to Disclose All of the Accounts Payable?

██ There is a sharp disagreement between the parties on whether Poole and Cur-

ry were given accurate information before the settlement on the store's payables. Poole and Curry testified they were not. Dugdale and Suder testified that they were. The bankruptcy court found Suder had delivered a current summary of payables to either Poole or Curry before the settlement. Dugdale and Suder's testimony provide substantial evidence in the record to support the bankruptcy court's finding. In addition, defendants offered evidence to explain apparent irregularities in the accounting for payables, including documents identifying the payables and Deese's testimony describing them. Those documents and that testimony constitute substantial evidence in the record to support the bankruptcy court's conclusion that plaintiffs were not misled as to facts material to the total payables due at closing.

### 4. Is the Defense of Laches Still Relevant?

The plaintiffs purchased Chequers' business in April 1984, filed a Chapter 11 petition in November 1985, and filed their complaint in this case a month later, in December 1985. One of the remedies the plaintiffs sought in their complaint was rescission of the purchase agreement.

Defendants answered the complaint in January 1986. In their answer, they alleged as affirmative defenses laches, estoppel, and waiver. These defenses were apparently based on their view that even if plaintiffs could show that they had been misled and might otherwise have a right to some equitable relief (such as rescission), their claims should nevertheless be barred by their delay in seeking to remedy the wrong they had discovered. See Elster v. American Airlines, Inc., 128 A.2d 801, 805 (Del.Ch.1957) ("When established, laches is deemed to constitute either an implied waiver of a remedy or if not strictly waiver, conduct of a type which equity will deem a bar to the application of a remedy otherwise available.")

 There may be reasons why the bankruptcy court should have declined to reach this issue. For example, it appears that defendants had asserted laches as a defense to plaintiffs' claim for rescission, where the court would undo the contract and return the purchase price to Poole and Curry and the store to the Dugdales. That claim probably expired with the store in 1986, as after the closing of the store, the court could no longer grant the equitable relief of restoring the parties to the status quo ante. Consequently, the issues raised by the defense of laches were moot, and had been moot for ten years before the bankruptcy court's decision. Second, laches is an affirmative defense. In this case, where the court has found after trial that the plaintiffs have failed to establish a basis for relief (and presumably that the defendants are entitled to a judgment on the claims) it may not make sense to then also grant judgment for the defendants that the plaintiffs' claims are also barred by laches. For these reasons, the court will enter an order reversing that part of the bankruptcy court's order that granted judgment for the defendants on their affirmative defense of laches.

### III. CONCLUSION

For the reasons set out above, the court will enter an order reversing the bankruptcy court's June 12, 1996 Order dismissing plaintiffs' claims and entering judgment in favor of defendants on the defense of laches. The court will confer with counsel about an appropriate form for that order and on the appropriate procedure to bring this matter to a just, speedy, and inexpensive resolution.