## In re BLACKSTONE POTATO CHIP CO., INC., Debtor.

## BLACKSTONE POTATO CHIP CO., INC., Plaintiff,

v.

## MR. POPPER, INC. and Robert Cournoyer, Defendants.

Bankruptcy No. 89–10873.
Adv. No. 89–1091.

United States Bankruptcy Court, D. Rhode Island.

Jan. 2, 1990.

---

Brian J. Spero, Charles A. Lovell, Partridge, Snow & Hahn, Providence, R.I., for plaintiff.

Susan M. Huntley, Licht & Semonoff, Providence, R.I., for defendants.

## DECISION AND ORDER

ARTHUR N. VOTOLATO, JR., Bankruptcy Judge.

Heard on December 11, 1989 on the Motion of the debtor, Blackstone Potato Chip Co., Inc. ("Blackstone"), for Leave to Reject an Executory Contract with Mr. Popper, Inc. ("Mr. Popper"), or in the alternative, to avoid the transfer of its interest in a license agreement, pursuant to 11 U.S.C. § 548. Mr. Popper has interposed a number of defenses to the motion, and submits

a variety of arguments in opposition, which we consider below.

## FINDINGS OF FACT

1. Sometime during late spring or early summer, 1989, with a view towards doing business together, principals of Mr. Popper, namely Robert Cournoyer, Lucien Durand, and Rita Harrison Cimini, toured the premises of the Blackstone Potato Chip Co. with its president and chief executive officer Theodore Dziok, Jr. In furtherance of their prospective joint venture, Dziok invited and encouraged Mr. Popper to compete with Boston Popcorn in the production and distribution of "light popcorn" and a white cheddar cheese popcorn. As part of his sales talk, Dziok represented to said principals that Blackstone owned the popping machines they were looking at, and which were necessary to manufacture these products. Dziok now admits however, that Blackstone, at that time, had an undisclosed ongoing agreement with (none-other-than) Boston Popcorn, with a non-competition understanding (*see* Stipulation of parties, para. 1), and that said agreement had been in effect for four years. It is also clear, after hearing, that the equipment necessary to produce "light popcorn" and white cheddar cheese popcorn was, and still is, owned by Boston Popcorn and therefore, not available to produce popcorn for Mr. Popper. Obviously, Dziok made some serious misrepresentations to Mr. Popper during the negotiations.

2. On July 27, 1989, Blackstone and Mr. Popper entered into a licensing agreement ("the agreement") for the use of the Blackstone trademark and tradename. (Defendants' Exhibit 2) The contract, drafted and prepared by Mr. Popper, was signed by Dziok on behalf of the debtor without the assistance of counsel, while Blackstone was in critical financial condition and while Dziok was experiencing a severe alcohol abuse problem, for which he subsequently sought and received professional treatment—not an agreement entered into between parties with equal bargaining power.

3. Although the agreement does not recite or enumerate any specific considera-

tion, we find, based on the totality of the evidence, that the parties intended that certain obligations stated within the contract, as well as in a number of side agreements, consisted, at most, of: (1) Mr. Popper's continuing the presence of the Blackstone name in the marketplace; (2) Mr. Popper's rental of space from Blackstone; (3) the assumption of truck rental payments by Mr. Popper; (4) the coverage by Blackstone of Mr. Popper's employees under Blackstone's Blue Cross insurance; (5) the employment by Mr. Popper of certain of Blackstone's drivers; (6) the purchase by Mr. Popper of certain inventory of Blackstone; (7) the production of popcorn by Blackstone for Mr. Popper; (8) the right by Mr. Popper to use the Blackstone name for four years; and (9) the obligation of Blackstone to hold Mr. Popper harmless against any license infringement actions.

4. On September 22, 1989, Blackstone filed for protection under Chapter 11 of the Bankruptcy Code. Shortly thereafter, Blackstone, through its attorneys, sent Mr. Popper a letter dated October 17, 1989 (Exhibit B to the Answer of Mr. Popper), in which Blackstone stated its intention to reject the license agreement, pursuant to § 365(a) of the Bankruptcy Code.

5. The value of the trademark and tradename was unknown by Dziok in July, 1989 when the agreement in question was executed, and he was oblivious to the value of the license until he conferred with his counsel during the initial stages of the Chapter 11 proceeding. It was only after being apprised as to the potential worth of the Blackstone name that Dziok attempted to bring assets back to the corporation to assist in the reorganization, by entering into negotiations with Deep Rock, Inc. ("Deep Rock") for license of the Blackstone name.

6. There is uncontroverted evidence that the present value of the tradename to the debtor, if it is able to recover the use of the name, is between $14,000 and $16,000 in the first year, with a total value of approximately $200,000 over four years. This is strong evidence that the license to use the tradename and trademark had sub-

stantially greater value in July, 1989, than what Mr. Popper agreed to provide.

7. Blackstone has exercised sound business judgment in concluding that the Deep Rock proposal, or others offering more than Deep Rock, have far greater potential for increasing revenues to Blackstone than the present Mr. Popper contract.

8. The following obligations presently exist between Blackstone and Mr. Popper: Blackstone is required to produce popcorn for Mr. Popper; to allow Mr. Popper to use the Blackstone name for four years; and to hold Mr. Popper harmless against license infringement actions. Mr. Popper is required to keep the Blackstone name "alive";[1] to purchase popcorn from Blackstone; to continue the employment of certain drivers and to assume Blue Cross payments; to assume truck rental payments; and to lease business space from Blackstone.

## CONCLUSIONS OF LAW

■ 1. The July 27, 1989 license agreement between Blackstone and Mr. Popper is an executory contract, which is still in full force and effect. Both parties to the contract have continuing obligations to each other, which mutuality of obligation confirms the executory nature of the agreement. "[A] contract is executory if performance is due to some extent on both sides." *NLRB v. Bildisco and Bildisco,* 465 U.S. 513, 104 S.Ct. 1188, 1194 n. 6, 79 L.Ed.2d 482 (1984); *In re Meehan,* 46 B.R. 96 (Bankr.E.D.N.Y.1985), *aff'd, Bregman v. Meehan (In re Meehan),* 59 B.R. 380 (E.D.N.Y.1986); *In re Chipwich, Inc.,* 54 B.R. 427, 429–430 (Bankr.S.D.N.Y.1985).

Mr. Popper's contention that Blackstone's inability to produce popcorn on Boston Popcorn's equipment for Mr. Popper renders the agreement nonexecutory, is rejected. The fact that Blackstone does not own the equipment necessary to turn out product for Mr. Popper does not void the contract as a matter of law. Blackstone has the continuing duty, as distinguished from the practical problem, to perform its part of the contract, which is still binding. (*See, e.g.,* paras. 3, 8, *ante* ).

■ 2. The debtor has properly elected to reject the July 27, 1989 license agreement, under the "sound business judgment" test. We agree with Blackstone that the business judgment standard is appropriate in determining whether a debtor may reject or accept an executory contract. *See, e.g., Lubrizol Enterprises v. Richmond Metal Finishers,* 756 F.2d 1043 (4th Cir.1985), *cert. denied, Lubrizol v. Canfield,* 475 U.S. 1057, 106 S.Ct. 1285, 89 L.Ed.2d 592 (1985); *In re Chi–Feng Huang,* 23 B.R. 798 (BAP 9th Cir.1982). Although Mr. Popper relies on two other standards, the "burdensome" test and the "balancing of the equities" test, we find very little support in the case law for the application of either of these tests, in place of the business judgment test, and we are in agreement with the 9th Circuit Bankruptcy Appellate Panel holding that "rejection of the burdensome test in favor of the 'business judgment' rule is dictated by logic as much as by precedent." *In re Huang, supra,* at 800. We also agree with the statement in *In re Huang, supra* that "the great weight of modern authority holds that whether an executory contract should be rejected is a matter within the business judgment of the trustee," and that "[v]irtually all recent Bankruptcy Court decisions follow this rule." *Id.* at 800 (citations omitted). Accordingly, in this district, we hold that the "business judgment test" is the proper standard to be applied in considering a debtor's motion to accept or reject an executory contract.

■ Under the business judgment test, "the primary issue is whether rejection would benefit the general unsecured creditors. This may involve a balancing of interests." *In re Huang, supra,* at 801; *In re Meehan,* 46 B.R. at 100–101. "The court may refuse to authorize rejection where the party whose contract is to be rejected would be damaged disproportionately to any benefit to be derived by the

---

**1.** As consideration to Blackstone under the agreement, this one is purely illusory, since Mr. Popper's intention is to retain and preserve the name for itself.

general creditors of the estate." *In re Meehan, supra,* at 101. The court in *In re Meehan, supra* observed however, that "the disappointment of a vender's expectations is not a sufficient ground standing alone to deny permission to reject." *Id.* at 101. Relying on the holding in *Robertson v. Pierce,* 23 B.R. 798, 801 (BAP 9th Cir. 1982), the *Meehan* court went on to explain that:

> Any rejection will inevitably entail the disappointment of legitimate expectations. A basic policy of the Bankruptcy laws is to spread the burdens evenly among both those who may have loaned the debtor money and those who might have obtained a profit from dealing with him.

*Meehan, supra,* at 101 (citing *Robertson, supra,* at 801).

■ In the instant case, it is clear that if the contract with Mr. Popper is not rejected, the unsecured creditors of Blackstone will receive nothing. If Blackstone is permitted to negotiate a new licensing agreement at least as favorable as the one proposed with Deep Rock, there is the present likelihood of a benefit to all unsecured creditors. For this reason we conclude that Blackstone's decision to reject the Mr. Popper contract meets the "sound business judgment" test.

Based upon all of the foregoing, we conclude not only that the debtor may reject the license agreement with Mr. Popper, but also, based upon the evidence, that any other decision by Blackstone would have to be considered unsound.

■ 3. Mr. Popper also argues that, because the license agreement does not contain a quality control provision, this constitutes a "naked license" which means, under federal trade law, that the right to the name is abandoned by Blackstone. This contention is and has to be rejected on the ground that Mr. Popper, who drafted the agreement, may not become the beneficiary of what it now argues is a fatal omission, created by itself! To accept this argument by the defendant would produce the ludicrous result that Mr. Popper would become the owner of the license, due to its own self-serving draftsmanship. *A.C. Beales v.*

*Rhode Island Hospital,* 110 R.I. 275, 292 A.2d 865 (1972) ("If there is an ambiguity or any omission, the agreement must be construed against the drafting party" *Id.* at 287, 292 A.2d 865).

■ 4. The evidence requires a finding that less than reasonably equivalent value was given by Mr. Popper for the use of the Blackstone name. We reach this conclusion after weighing both the consideration agreed to be given by Mr. Popper, and the value of the license testified to by Dziok and Kabakoff, as evidenced by the Deep Rock offer. Even though the Deep Rock offer is not in the exact same time frame as the agreement with Mr. Popper, we find the Deep Rock offer to be relevant and persuasive evidence of what the value of the license was at the time the Mr. Popper contract was entered into, just five months ago. Based upon the entire record, we are satisfied that the consideration then agreed to by Mr. Popper was less than reasonably equivalent value, as required under § 548.

■ 5. In addition to the above findings and conclusions, and even though the subject has not been argued, we feel required to consider the value of Mr. Popper's contribution to the preservation of the estate during the time when Dziok was unable to operate the company. Because of Dziok's misstatements and misrepresentations, made to induce Mr. Popper to enter into the agreement, the equities weigh in favor of Mr. Popper, as to how it (Popper) should be treated, vis-a-vis other creditors, in the event of any distribution in this case. We are aware of, but distinguish *In re Chipwich, Inc., supra,* at 429, and § 502(g) of the Code, in light of the facts before us, and conclude that the continued presence of the Blackstone name in the marketplace, due to the efforts of Mr. Popper, constituted a significant act of preservation of estate assets which entitles it to an administrative expense priority under § 503(b)(1). Accordingly, it is ordered that any plan proposed by the debtor shall recognize, to the extent that there was benefit to the estate, Mr. Popper's status as a priority creditor, to be paid before the claims of unsecured creditors.

6. The determination of the issues concerning Blackstone's application of checks

intended for Mr. Popper, the alleged outstanding balance due Blackstone by Mr. Popper, the loss of profits suffered by Mr. Popper on account of Blackstone's inability and/or failure to produce popcorn, and all other related damage issues are saved for future consideration, on Mr. Popper's general unsecured claim for breach of its executory contract.

Accordingly, based upon the above Findings of Fact and Conclusions of Law, it is ORDERED that:

1. Blackstone's Motion to Reject its executory contract with Mr. Popper is GRANTED.

2. Blackstone's Motion to avoid the transfer of its tradename, pursuant to § 548, is GRANTED.

3. The Blackstone license and/or tradename is transferred back to the debtor.

4. Mr. Popper shall withdraw, forthwith, any and all trademark and tradename registration applications pending before the United States Commission of Patents and Trademarks, or any other registration authority, with regard to the name Blackstone.

Enter Judgment accordingly.