**In re HQ GLOBAL HOLDINGS, INC., et al., Debtors.**

No. 02–10760 (MFW).

United States Bankruptcy Court, D. Delaware.

Feb. 25, 2003.

Daniel J. DeFranceschi, Russell C. Silberglied, Etta R. Wolfe, Richards, Layton & Finger, P.A., Wilmington, DE, Corinne Ball, Andrew L. Buck, Jones, Day, Reavis & Pogue, New York City, Counsel for Debtors.

Stephen T. Davis, Lawrence J. Tabas, Dorothy M. Claeys, Obermayer, Rebmann, Maxwell & Hippel, LLP, Wilmington, DE, Counsel for the Franchisees' Committee and Certain Individual Franchisees.

Kevin Gross, Rosenthal, Monhait, Gross & Goddess, P.A., Wilmington, DE, Mark S. Indelicato, Hahn & Hessen, LLP, New York City, Counsel for the Official Committee of Unsecured Creditors.

### MEMORANDUM OPINION [1]

MARY F. WALRATH, Bankruptcy Judge.

### I. INTRODUCTION

Before the Court is the Motion of HQ Global Holdings, Inc. and its related entities (collectively "the Debtors") to reject certain License Agreements (collectively "the Agreements") with certain Franchisees.[2] The Franchisees' Committee and the Individual Franchisees oppose the Motion asserting that the Agreements are not executory contracts under section 365 of

---

**1.** This Opinion constitutes the findings of fact and conclusions of law of the Court pursuant to Federal Rule of Bankruptcy Procedure 7052, which is made applicable to contested matters by Federal Rule of Bankruptcy Procedure 9014.

**2.** The original motion sought to reject ten Agreements but the rejection of two of the Agreements (with Dallas Metro Suites, Inc.)

was settled via stipulation. The remaining eight Agreements are with seven Franchisees: K–2 Enterprises d/b/a HQ Oakland, Rostex, Inc., Execuplex Inc. d/b/a Headquarters Companies, Bradlie Business Service, Inc., International Office Network, LLC, Giffnock Corp. (a sub-licensor from Waverly Associates, Inc.), and Calvin C. Zoeller.

the Bankruptcy Code. In the alternative, the Franchisees assert that, even if the Agreements are executory, the Debtors have not used proper business judgment in deciding to reject the Agreements. Finally, the Franchisees assert that, if the Agreements are rejected, they will still retain their right to use the HQ Proprietary Marks.

For the reasons set forth below, we grant the Debtors' Motion to reject and conclude that the Franchisees' right to use the trademarks is extinguished.

## II. *FACTUAL BACKGROUND*

The Debtors are a full service office space lessor. The Debtors provide office space plus support services such as telephone lines, reception, videoconferencing and other amenities. In addition to operating their own centers, the Debtors entered into licensing agreements with the Franchisees granting them exclusive rights to use of "certain trade names, trademarks, service marks, logos, emblems, insignia, and other indicia of origin" ("the HQ Proprietary Marks"). (The Agreements, § 1.04.[3]) In exchange for exclusive use of the HQ Proprietary Marks, the Franchisees agreed to pay royalty fees of one to one and a half percent of monthly revenues to the Debtors. The Franchisees are required to keep at least one HQ center in operation and use their best efforts to pursue vigorously the highest possible market penetration while meeting the HQ Standards of operation as defined by the Debtors. None of the Agreements contain a non-competition clause, but if the Debtors operate in the exclusive Franchi-

see territories, the Debtors have agreed not to use the HQ Proprietary Marks.

Under the Agreements, the Debtors have the option to provide certain support services at their sole discretion and at the expense of the Franchisees. The Debtors are required to produce a yearly directory of all HQ center locations, including the Franchisees.

In 2000 the Debtors purchased a competitor, Vantas Industries. When the purchase was made, several Vantas locations were located within the Franchisees' exclusive territories. As a result, the Debtors have continued to operate the acquired centers under the Vantas name.

## III. *JURISDICTION*

This Court has jurisdiction over this matter as a core proceeding pursuant to 28 U.S.C. §§ 1334 and 157(b)(1), (b)(2)(A) and (O).

## IV. *DISCUSSION*

There are three issues before the Court. First, are the Agreements executory contracts under section 365? Second, if the Agreements are executory, have the Debtors exercised proper business judgment in rejecting the Agreements? Third, if the contracts are rejected, do the Debtors have any remaining obligations?

### A. *Executory Contracts*

Section 365 of the Bankruptcy Code allows debtors in possession to reject "any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). The Bankruptcy Code does not define "executory contract," but the accepted definition is that of Professor Countryman: "An ex-

---

**3.** One of the Agreements granted an exclusive license from Debtor HQ Network Systems, Inc. to Debtor Executive Office Network, Ltd. for the territory of Manhattan, New York City, New York ("the Manhattan Agreement").

Debtor Executive Office Network, Ltd. then sub-licensed the right to the HQ Proprietary Marks in Manhattan to Franchisee International Office Network, LLC on a non-exclusive basis.

ecutory contract is a contract under which the obligation of both the bankrupt and the other party to the contract are so far underperformed that the failure of either to complete performance would constitute a material breach excusing the performance of the other." *In re Columbia Gas Sys. Inc.*, 50 F.3d 233, 239 (3d Cir.1995) (*citing Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36, 39 (3d Cir.1989)). In determining whether a contract is executory, the Third Circuit has emphasized whether the failure to perform an obligation under the contract would constitute a material breach. *Columbia Gas*, 50 F.3d at 244; *In re Access Beyond Techs., Inc.*, 237 B.R. 32, 43 (Bankr.D.Del. 1999). The time for determining if a contract is executory is when the bankruptcy petition is filed. *Columbia Gas*, 50 F.3d at 240 (citations omitted).

■ The Debtor cited three cases as examples of license agreements upheld as executory contracts. *See Blackstone Potato Chip Co. v. Mr. Popper (In re Blackstone Potato Chip Co.)*, 109 B.R. 557 (Bankr.D.R.I.1990)(finding a license agreement bundled with multiple other underperformed "side agreements" to be an executory contract); *Richard Royce Collection Ltd. v. New York City Shoes, Inc. (In re New York City Shoes), Inc.*, 84 B.R. 947, 960 (Bankr.E.D.Pa.1988)(plaintiff's naked assertion that the license agreement was non-executory was not enough: "[the trademark licensing agreement] certainly appears to fit ... the classic 'executory contract' definition of a contract that has not been fully performed on both sides"); *In re Chipwich, Inc.*, 54 B.R. 427 (Bankr.S.D.N.Y.1985)(the debtor's continuing duty to report infringements of the licensed trademarks to the licensee, to institute proceedings at its own expense and to indemnify the licensee for any damages rendered the license agreement

executory). The facts of this case are distinct enough to warrant its own analysis. Accordingly, we analyze the Agreements under the traditional Countryman guidelines.

The Agreements unquestionably contained unperformed obligations due from the Franchisees as of the petition date. The Franchisees are required to keep at least one HQ center open in their respective territories and must pay monthly royalty payments to the Debtors while maintaining the HQ Standards of operation. Operating reports are required to be generated and submitted to the Debtors on a monthly basis. Failure to meet any of these requirements is a default under the Agreements and could be considered a material breach.

With respect to the Debtors' commitments, however, the Franchisees assert that the Debtors fully performed the Agreements prepetition. For example, the Debtors are not required to arrange refresher and update conferences, but if the Debtors do so, the licensee is required to pay its pro rata share. The Debtors also may in their discretion (but are not required to) provide additional services to certain licensees, for which they are paid on an a la carte basis.

This argument overlooks the essential nature of the Agreements—a license for the exclusive use of the HQ Proprietary Marks in certain territories. Under the Agreements, the Debtors may not use the HQ Proprietary Marks in the territories it has granted to the Franchisees (with the exception of the Manhattan territory). The Debtors' agreement to forbear from using the HQ Proprietary Marks in the exclusive Franchisee territories is an ongoing material obligation as of the petition date. *Cf. Lubrizol Enterprises, Inc. v. Richmond Metal Finishers, Inc.*, 756 F.2d 1043 (4th Cir.1985)(in analyzing a non-ex-

clusive technology license, the core obligation of forbearance in licensing to others made the contract executory). If the Debtor were to use the HQ Proprietary Marks within the exclusive territories, it would be a material breach. Thus, we conclude that the exclusive Agreements are executory on both sides.

■ With respect to Manhattan, the one non-exclusive Agreement, the Debtors are still obligated to permit the Franchisees to use the HQ Proprietary Marks for the life of the licenses. Interference with the Franchisees' use of the marks would also be a material breach of the license granted to the Franchisees, since the essence of the Agreement is to permit the Franchisees to use the Debtor-owned HQ Proprietary Marks.[4] As long as the royalty payments are made and the operation standards are met, the Debtors must permit the Franchisees' use of the marks. This is an executory contract. *See, e.g., Everex Sys., Inc. v. Cadtrak Corp. (In re CFLC, Inc.),* 89 F.3d 673, 677 (9th Cir. 1996)(a patent license constitutes an executory contract because a license is "in essence, a mere waiver of the right to sue the licensee for infringement").

Consequently, we conclude that all eight Agreements are executory contracts under section 365.

### B. *Rejection of the Agreements*

■ A debtor's decision to reject an executory contract under section 365 is governed by the business judgment standard. *Group of Inst. Investors v. Chicago, Milwaukee, St. Paul, and Pac. R.R. Co.,* 318 U.S. 523, 550, 63 S.Ct. 727, 87 L.Ed.

959 (1943). Under the business judgment standard, the sole issue is whether the rejection benefits the estate. *N.L.R.B. v. Bildisco (In re Bildisco),* 682 F.2d 72, 79 (3d Cir.1982)(the "usual test for rejection of an executory contract is simply whether rejection would benefit the estate, the 'business judgment' test"), *affirmed* 465 U.S. 513, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984). A debtor's determination to reject an executory contract can only be overturned if the decision was the product of bad faith, whim or caprice. *See, e.g., In re TWA,* 261 B.R. 103, 121 (Bankr.D.Del. 2001); *Wheeling–Pittsburgh Steel Corp. v. W. Penn. Power Co. (In re Wheeling–Pittsburgh Steel Corp.),* 72 B.R. 845, 849–50 (Bankr.W.D.Pa.1987).

■ The Franchisees assert that the rejection decision in this case is the result of capriciousness and whim. While the Franchisees raised many relevant issues regarding the Debtors' decision to reject the Agreements, none of them rise to the level of whim or caprice. For example, the Franchisees argued that competition from the rejected Franchisees will not disappear if the Franchisees are forced to discontinue use of the HQ Proprietary Marks, but their own expert admitted that the HQ name and synergy "could affect" a prospective client's choice of provider. Thus the evidence suggests that rejection of the Agreements, which will permit the Debtors to use the HQ Proprietary Marks, is likely to benefit the estate.

The Franchisees also assert that the rejection of the Agreements could give rise to large rejection damages, but offered no evidence of what they would be. In re-

---

**4.** The Agreements clearly state that the marks are to remain the property of the Debtor and that the license does not give rise to an ownership interest. In fact, the Agreements forbid the Franchisees from challenging the Debtors' ownership of the marks. The Fran-

chisees assert that the Agreements constitute some kind of conveyance of a property right rather than a contract right under section 365, but the plain language of the Agreements defeats that argument.

sponse, the Debtors' expert testified that by rejecting the contracts and retaining business that would otherwise go to the Franchisees' centers could raise the Debtors' revenues by an estimated 800%. The increase results from the Debtors' ability to capture this business instead of being obligated to refer it to the Franchisees in exchange for a commission of only 7.5% of the contract's initial value. The Debtors' expert further testified that most of this captured revenue would go "straight to the bottom line" since most of the Debtors' costs are fixed. The Debtors' have already rented the space so additional tenants will increase cash flow with very little additional cost.

The Debtors also assert that rejection of the Agreements will cut costs for the Debtors. For example, they claim they would save duplicative advertising costs they now expend on promoting the Vantas brand in the current Franchisee territories, which the Debtors estimated costs two or three times the amount of royalties received from the Franchisees. It is not entirely clear that the entire Vantas advertising amount would be saved by the rejection of the Agreements, but some savings will certainly be achieved.

In addition to the monetary implications of rejection, the Debtors point to a significant operational shortcoming of the Agreements: that the Debtors cannot force the Franchisees to expand their operations within their exclusive territories. While there is language in the Agreements requiring the Franchisees to pursue "vigorously the highest possible market penetration" in a given territory, there is no development time line or target contained in the Agreements. Instead, the Franchisees in their sole discretion may operate as many centers as they see fit but are only required to keep one center in operation. The Debtors assert that rejection of the

Agreements would provide the Debtors the necessary flexibility to expand operations in viable territories with a cohesive plan.

■ The Franchisees argue that the Debtors are discriminating in their Motion. They note that the Debtors are in competition (under the Vantas mark) with *other* licensees whose franchise agreements they have not yet rejected. This argument is not persuasive. The only issue presented is whether the Debtors exercised sound business judgment in determining to reject these eight Agreements. What the Debtor does or does not do with respect to other licensees in other territories has no bearing on the current analysis. The Bankruptcy Code authorizes a Debtor to assume or reject an executory contract or unexpired lease on a case by case basis.

Applying the business judgment standard, we conclude that the Debtors' decision to reject the Agreements is based upon a determination that it will benefit the estate and is not the result of bad faith, whim or caprice. Consequently, the Debtors' decision to reject the Agreements is upheld.

### C. *Implications of Rejection*

■ In the event of rejection of an executory contract, the holder of such contract is left with a claim for rejection damages unless section 365 provides additional protection. 11 U.S.C. § 365. Licensees of intellectual property receive special treatment under section 365(n): namely, they can elect to treat the contract as terminated or retain their rights to the intellectual property so long as they continue to pay royalties. As defined by section 101(35A) of the Bankruptcy Code, intellectual property "means—(A) trade secret; (B) invention, process, design, or plant protected under title 35; (C) patent application; (D) plant variety; (E) work of authorship pro-

tected under title 17; or (F) mask work protected under chapter 9 of title 17." 11 U.S.C. § 101(35A). Trade names, trademarks, and other proprietary marks are expressly excluded from the definition of "intellectual property." *See, e.g., Raima UK Ltd. v. Centura Software Corp. (In re Centura Software Corp.)*, 281 B.R. 660 (Bankr.N.D.Cal.2002)(under the plain language of the statute, trademark licenses are not included in section 365(n)). As a result, the Franchisees are not protected by section 365(n). The Franchisees therefore have only a claim for rejection damages under section 365(g)(1). *Id.*

The Franchisees assert that, despite their lack of protection under section 365(n), they may nonetheless continue to use the HQ Proprietary Marks in exchange for the payment of royalties. This argument is premised on a footnote in *Gucci v. Sinatra (In re Gucci)*, 126 F.3d 380 (2d Cir.1997), which reiterates the familiar maxim that rejection does not terminate or repudiate a contract but simply relieves the estate from its obligation to perform. *Gucci*, 126 F.3d at 384 n. 1 (*citing Med. Malpractice Ins. Ass'n v. Hirsch (In re Lavigne)*, 114 F.3d 379, 387 (2d Cir.1997)); *see also Columbia Gas*, 50 F.3d at 239 n. 8 (rejection is equivalent to a nonbankruptcy breach); *In re Drexel Burnham Lambert Group*, 138 B.R. 687, 703 (Bankr.S.D.N.Y.1992)("Rejection of an executory contract is not the equivalent of termination of the contract. It is only a breach"). The Franchisees argue that, while the Debtors' affirmative obligations of performance are excused, the Franchisees may still use the HQ proprietary marks.

This argument misses the mark entirely. The essence of the Agreements was the Debtors' affirmative grant to the Franchisees of the right to use their proprietary marks. As a result of the rejection, that affirmative obligation of the Debtors to allow the Franchisees to use the marks is excused. *See, e.g., Raima*, 281 B.R. at 673 ("both pre and post-amendment [i.e. § 365(n)] cases as well as scholarly writings suggest that, upon the rejection of a trademark license, *Lubrizol's* harsh holding controls, and the licensee is left with only a claim for breach").[5] In other words, since the Bankruptcy Code does not include trademarks in its protected class of intellectual property, *Lubrizol* controls and the Franchisees' right to use the trademarks stops on rejection. *Raima*, 281 B.R. at 673, n. 24; *see also Chipwich*, 54 B.R. 427 (a pre § 365(n) case citing *Lubrizol* for the principle that only a damage claim arises from the rejection of a trademark license); *Blackstone*, 109 B.R. 557 (a post § 365(n) case holding a trademark licensee is only entitled to a general unsecured claim for the debtor's breach of its executory contract).

The result of the Debtors' rejection of the Agreements is that they are relieved from the obligation to allow the Franchisees to use their proprietary marks and the Franchisees' rights to use the marks are thereby extinguished.

## V. CONCLUSION

For the foregoing reasons, we conclude that the Agreements are executory contracts under section 365 of the Bankruptcy Code. We also conclude that the Debtors have met the business judgment standard

---

**5.** The *Lubrizol* Court, in analyzing a debtor's rejection of a non-exclusive technology license, concluded that the non-bankrupt licensee had only a money damage remedy and no further rights under the agreement to use the technology under section 365. *Lubrizol*, 756 F.2d 1043. Congress then enacted section 365(n) to protect a licensee's right to continue the use of intellectual property post-rejection but specifically excluded trademarks from that protection. *Raima*, 281 B.R. at 668, n. 10; 11 U.S.C. §§ 101(35A) & 365(n).

with respect to their decision to reject the Agreements and that the Debtors' determination to reject the Agreements was not the result of bad faith, whim or caprice. As a result of the Debtors' rejection, we further conclude that the Franchisees are left with only a claim for rejection damages under section 365(g)(1) of the Bankruptcy Code and their rights to use the Debtors' proprietary marks are extinguished by the rejection.

The Franchisees request continued use of the HQ Proprietary Marks through the end of 2003 while the Debtors suggest a thirty (30) day transition period phasing out the Franchisees' use of the marks. There is no authority for any transition period, thus we accept the Debtors' suggestion that the Franchisees shall have thirty days in which to cease using the HQ Proprietary Marks.